Ryan Brothers, Inc., Appellant, *v.* Curwensville State Bank.

Argued May 2, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Robert V. Maine,* with him *Edward T. Kelley* and *Smith, Maine, Whitsett & Lee,* for appellant.

*Walter M. Swoope,* with him *Bell, Silberblatt & Swoope,* for appellee.

Opinion by Mr. Justice Jones, May 25, 1955:

This action in assumpsit was instituted by Ryan Brothers, Inc., a coal operator, against Curwensville State Bank to recover $18,271.55, representing the price of coal sold by the plaintiff through its exclusive sales agent, Cassler Coal Sales Agency, for which the defendant bank made collection, crediting the proceeds to the account of the Sales Agency without the plaintiff's knowledge and which account the bank later appropriated for the payment of debts due it by the Sales Agency.

The defendant filed preliminary objections to the complaint which were overruled and the defendant answered to the merits. The case came on for trial before the late Honorable Henry Hipple, President Judge of the 25th Judicial District, specially presiding, to whom the case was tried without a jury pursuant to written stipulation of the parties in accordance with the Act of April 22, 1874, P. L. 109, 12 PS §688.

On April 17, 1951, Judge Hipple filed an opinion containing extensive findings of fact and conclusions of law and an order *nisi* directing the prothonotary to enter judgment for the defendant. The plaintiff duly filed exceptions to the findings, conclusions and order, and oral argument thereon was had. Judge Hipple's untimely death occurred before he had passed on the exceptions. Reargument was thereafter had before Honorable Robert M. Morris, President Judge of the 54th Judicial District, specially presiding. By order dated June 12, 1954, Judge Morris dismissed the plaintiff's exceptions, and judgment for the defendant was entered in due course. This appeal by the plaintiff followed.

The question of the defendant's liability to the plaintiff depends upon whether the bank knew or had reasonable cause to know that certain of the funds

which it collected from purchasers of plaintiff's coal, and credited to an account of the Sales Agency in the bank, were in fact the property of the plaintiff. The unquestioned documentary evidence and the undisputed facts in the case leave no doubt that the bank had or should have had such knowledge. A mere recitation of the material evidence will readily so disclose.

In 1943 Ryan Brothers, Inc., and Cassler Coal Sales Agency entered into an exclusive sales agency agreement which provided for the sale and invoicing of Ryan's coal by Cassler on a fixed commission basis. The agreement provided that all invoices for the plaintiff's coal, sold by the agent, should be made payable to Curwensville National Bank (later absorbed by the Curwensville State Bank, the present defendant). The bank was to remit directly to the plaintiff as collections were received by the bank for the plaintiff's coal.

James Mitchell, Jr., was executive vice president of the National Bank and later became cashier and treasurer of the successor State Bank. Prior to the execution of the agency agreement the plaintiff's president and a partner of the Sales Agency discussed with Mitchell the procedure to be followed in invoicing and handling the proceeds from the plaintiff's coal. Thenceforth, Mitchell handled the bank's part of the arrangement.

In practice, from 1943 until the end of 1945 invoices covering sales of plaintiff's coal were prepared in quadruplicate by the Agency's bookkeeper on Cassler Sales Agency forms. The invoices, numbered and dated, identified each shipment by name of the purchaser, the car number, weight of the coal shipped, price per ton, amount due and the name of the particular mine whence the coal had come. The original and the three copies of each invoice were identical except that the copies each carried a statement showing

the amount due the plaintiff for the coal covered by the invoice and the amount due the Cassler Agency for its commission. The original invoice was mailed by the Agency to the purchaser of the coal. One copy of the invoice (containing the information as to the proportions of the proceeds from the coal due the plaintiff and the agent respectively) was delivered to the bank, another copy to the plaintiff producer, and the third copy was retained by the Agency.

All customers' checks in payment for the plaintiff's coal were made payable to the order of the bank. And, the only remittances to the plaintiff for its coal were made by the bank with its treasurer's or cashier's checks drawn to the order of the plaintiff but transmitted to it by the bank through the Cassler Agency. From 1943 to the end of 1945, during which time the above-described procedure was uniformly followed, large sums of money were collected by the bank for the plaintiff's coal sold through the Cassler Agency, and the plaintiff's share of the proceeds, as indicated by the invoices, was disbursed to the plaintiff by the bank.

After January 1, 1946, the bank received for collection in the usual manner six checks drawn by purchasers of plaintiff's coal and made payable to the order of the bank. From the proceeds thereof there was due and payable to the plaintiff the aggregate sum of $18,271.55 according to the invoices which the bank had received from the Cassler Agency either at or prior to receipt of the corresponding checks of the purchasers. All six checks were collected by the bank in due course, but none of the proceeds was ever remitted to the plaintiff.

The defendant bank maintained several different accounts relating to the business affairs between it and the Cassler Agency. One was a checking account

in the name of "Cassler Coal Sales Agency"; two others were "Distribution" accounts differently titled but with the name Cassler Coal Sales Agency appearing as a part of each designation. The "Distribution" accounts were merely for convenience of the bank in recording its collections relating to the business of the Cassler Agency and were not the usual checking accounts maintained by a bank for customers in the ordinary course of business. The "Distribution" accounts differed from a checking account in a number of important particulars. Only purchasers' checks to the bank's order for coal sold by the Cassler Agency were credited to the "Distribution" accounts; the slips for deposit of such checks were prepared by Mitchell, the bank's officer, and not by the Agency; no periodic or other statements of the "Distribution" accounts were ever furnished anyone outside the bank; no pass books were issued and no signature cards required in respect of the "Distribution" accounts; and, only the bank drew on those accounts.

The six checks above mentioned, which the bank received in payment of invoices for plaintiff's coal, were deposited by the bank between January 25 and March 16, 1946, to the credit of one or the other of the Cassler "Distribution" accounts maintained by the bank. At that time the bank was owed by the Cassler Agency for loans to itself and customers a total of $24,600. The bank charged the indebtedness due on these loans to the checking account in the name of "Cassler Coal Sales Agency" after first having credited that account with corresponding amounts charged to the "Distribution" accounts. Of the moneys so used to pay the debts of the Cassler Agency, only $4,800 represented accumulated commissions due the Agency. There being nothing left to the credit of the various Cassler bank accounts after the above-described setoffs, the

bank refused the plaintiff's demand for payment of the balance due it which the defendant had collected. This suit followed.

The 11th finding of fact of the learned trial judge aptly describes the material aspects of the controversy as follows,—"In January and February, 1946, Cassler Agency received six checks from Greenpoint Coal Docks, Inc., of Brooklyn, N. Y. and Winslow-Knickerbocker Coal Company of Philadelphia, Pa., both purchasers of coal from Cassler Agency, covering for the most part, payment for shipments of Ryan Bros. coal. Cassler presented these checks to Mitchell at the Curwensville State Bank, where Mitchell, for the amount of three of the checks and at the direction of Cassler, immediately either credited Cassler Agency checking account, or made out bank checks to coal producers, but not Plaintiff, or paid off Cassler Agency notes held by the Bank. The amounts of the other three checks he credited to the special Cassler Agency account. During this period and until March, 1946, Cassler Agency at various times instructed Mitchell to distribute the amounts in the special Cassler Agency account for the purpose of paying producers, but not Plaintiff, paying off notes held by the Bank covering loans to Cassler Agency, and crediting Cassler Agency checking account. On March 25, 1946, the special Cassler Agency account had little or no balance, and Plaintiff had not been paid by Cassler Agency for the value of coal previously sold by Plaintiff amounting to $18,271.55."

The error of the court below did not lie in its findings of fact but in its conclusions of law. It failed to apply the pertinent rule to the facts as found. In *Sherts v. Fulton National Bank of Lancaster*, 342 Pa. 337, 339, 21 A. 2d 18, Mr. Justice STERN recognized for the court that "All the authorities agree that if a bank has knowledge, or notice of facts enough to put

it upon inquiry, that the funds in a depositor's account actually belong to a third person, it may not apply such funds to a debt owed to it by the depositor individually." As in that case, this principle was sufficient in itself to require that the court below enter judgment against the bank and in favor of the plaintiff.

In the earlier case of *Franklin Trust Company of Philadelphia*, 319 Pa. 367, 179 A. 592, it was held that a bank may not set off against a debt due it by a depositor, individually, deposits in accounts in the name of the depositor with special designations added where the funds represented by such deposits are in fact the property of third persons. It was there directly held that this is so even though the bank has no knowledge, beyond the special designations of the accounts, of any facts indicating the nature of the depositor's business or the nature of the funds contained in the accounts. In the *Sherts* case, supra, it was specifically remarked that in the *Franklin Trust Company* case we had ranged ourselves definitely with those jurisdictions which have adopted the so-called "equitable rule" there followed. See, also, *Witherow v. Weaver*, 337 Pa. 488, 491, 12 A. 2d 92.

The instant case is even a stronger one for the plaintiff than the cases above cited. Under their ruling, the special designation of the Cassler "Distribution" accounts would of itself have been sufficient to bind the bank with notice that the funds therein contained were presumptively the property of third persons and, therefore, not subject to setoff by the bank for a debt due it by the depositor individually. But, here, the bank had actual notice that there was $18,000 odd belonging to the plaintiff that was in the Cassler "Distribution" accounts when the bank charged those accounts (practically to exhaustion) in order to credit

Cassler's individual checking account with corresponding sums. Mitchell's knowledge was the knowledge of the bank for which he was authorized to act in respect of the various Cassler accounts. It was he who set up the method for the collection and distribution of the proceeds of the Cassler Agency's sales of coal for various producers including the plaintiff. Mitchell knew at all times from the information contained on the paid invoices exactly how much money due the plaintiff was in the Cassler "Distribution" accounts. To suggest that, when acting for the bank in the premises, Mitchell did not know that he was using money belonging to the plaintiff to pay the Cassler Agency's debt to the bank would be to ascribe to him less than ordinary intelligence. Nor is it of any significance that Mitchell took directions from Cassler as to the distribution of the proceeds of the six checks received in payment of the plaintiff's coal: see *Witherow v. Weaver*, supra, at p. 492.

The judgment is reversed and the record remanded with directions that judgment be entered for the plaintiff for the full amount of its claim with interest from the various due dates as shown by the complaint.