855 A.2d 818

**PIONEER COMMERCIAL FUNDING CORP. and Bank One, Texas, N.A.**

v.

**AMERICAN FINANCIAL MORTGAGE CORP. and Thomas F. Flatley and Northwest Funding, Inc. and Corestates Bank, N.A.**

**Appeal of Corestates Bank, N.A.**

Supreme Court of Pennsylvania.

Argued April 13, 2004.

Decided Aug. 19, 2004.

Arlin M. Adams, Michael M. Baylson, Ralph G. Wellington, Nolan N. Atkinson, Attorney Carl A. Solano, Philadelphia, Andrew Frey, Pro Hac Vice, New York, NY, for Corestates Bank, N.A.

Charles William Mooney, Jr., for Pennsylvania Bankers Association.

Marc J. Sonnenfeld, Philadelphia, for PA Chamber of Business and Industry.

Edward M. Mahon, Philadelphia, for The Federal Reserve Bank of Philadelphia.

David R. Moffitt, Philadelphia, Miles H. Shore, Gabriel L. Bevilacqua, Philadelphia, for American Financial Mortgage Corp., Thomas F. Flatley.

Howard Jonathan Bashman, Fort Washington, Maurice Robert Mitts, Philadelphia, for Pioneer Commercial Funding Corp., et al.

Stephen P. McCarron, for Sysco Corporation.

BEFORE: CAPPY, C.J. and CASTILLE, NIGRO, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice SAYLOR.

This appeal is centered on a commercial priority dispute between a banking institution exercising setoff against a general deposit account and a company asserting a third-party interest in the account proceeds, in the nature of absolute ownership and/or a perfected security interest.

Appellee, Pioneer Commercial Funding Corp. ("Pioneer") is a publicly-traded company that operated as a real estate warehouse lender in California. As such, Pioneer provided funding to small-to medium-sized companies originating loans to home buyers.[1] Pioneer obtained its own primary funding via a line of credit extended by a consortium of lenders operating through a Texas financial institution known as Bank One Texas, N.A. ("Bank One").

1. *See generally Regions Bank v. Provident Bank, Inc.,* 345 F.3d 1267, 1270–71 (11th Cir.2003) (setting forth a succinct description of the warehouse lending practices); 2 BARKLEY CLARK, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶ 7.08[2][b] (1999) (same).

In the usual course of affairs, loan originators receiving funding from Pioneer repaid their obligations using the proceeds from bulk sales of the loans to one or more third-party investors comprising a secondary market, thus enabling Pioneer to meet its own obligations to Bank One. Pending such sales, under the terms of loan and security agreements, Pioneer maintained a security interest in, *inter alia,* the original promissory notes signed by home buyers, as well as proceeds from their sale.[2] Perfection was accomplished by means of possession of the negotiable instruments in bearer form—as home purchase transactions closed, the loan originators endorsed the notes in blank and delivered them to Pioneer, together with blank assignments and other security documentation.[3] Pursuant to a three-party agreement between Pioneer, the loan originator, and Bank One, Pioneer delivered these collateral packages to Bank One, to secure Pioneer's own credit line pending the resale.[4] Upon the resale, the notes were endorsed and transmitted to the purchaser with a shipping request (including wiring instructions for the sale proceeds) and bailee letter, a document employed as a general convention in the warehousing lending industry to permit a secured creditor to release possession of negotiable instruments to prospective purchasers without surrendering perfection.[5] The purchaser, in turn, wired funds to a restricted

2. *See* 13 Pa.C.S. § 1201 (defining "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation"); 13 Pa.C.S. § 9203(f) (providing for attachment of a security interest in proceeds from the sale of collateral).

3. *See* 13 Pa.C.S. § 9313 (providing for perfection by possession). *See generally* 2 CLARK, THE LAW OF SECURED TRANSACTIONS ¶ 7.08[2][b].

4. Under the three-party agreement, Bank One held the collateral as agent for its consortium of lenders, Pioneer, and the loan originator.

5. *See* 13 Pa.C.S. § 9313(h); *see also* 13 Pa.C.S. § 9–305 (superseded). *See generally* WILLIAM B. HAWKLAND, 9B HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 9–313:4 (2002); 2 CLARK, THE LAW OF SECURED TRANSACTIONS § 7.08[2][b] (describing the bailee-with-notice concept underpinning Section 9-313(h) as a "dependable and commercially reasonable method to maintain perfected status on third-party notes that are in the possession of prospective investors" and a "critical legal device for the warehouse lending industry."). A true bailment is a specific-purpose transfer of possession only, in which absolute ownership remains in the

Pioneer account at Bank One, and Bank One was repaid from that account, thus completing the transaction.

At the center of this litigation is a business arrangement that was markedly different from Pioneer's usual course dealings, involving a California loan originator known as RNG Mortgage Services, Inc. ("RNG") and American Financial Mortgage Corporation ("AFMC"), a Pennsylvania company in the same business. As background, in the spring of 1997, Pioneer committed to serving as RNG's warehouse lender, and the companies executed loan and security and three-party agreements establishing the usual governing terms and conditions. This relationship, however, was compromised after August of 1997, when RNG sought protection under Chapter 11 of the federal Bankruptcy Code. RNG's financial condition impaired its ability to attract investors from the secondary market, given its inability to assure them recourse, thus threatening its ability to survive as a going concern. About the same time as RNG was seeking avenues to allow it to continue its operations, AFMC was exploring expansion opportunities. Learning of RNG's circumstances, AFMC began investigating a possible acquisition of the California company's assets, the most valuable of which was its portfolio of unfunded mortgage commitments, referred to in the industry as a loan "pipeline."

Both AFMC and RNG thus had an interest in maintaining RNG as a going concern while AFMC considered the acquisition. To accomplish this, they devised an arrangement whereby AFMC would receive an effective assignment of the loans, assume recourse responsibility relative to them, and sell them in the secondary market. Pioneer was also made a party to the discussions, as AFMC and RNG desired to obtain continued funding from Pioneer for loans in the pipeline. Pioneer elected to participate for its own reasons, apparently related to its desire to obtain the existing business and the prospect of a future warehouse lending relationship with AFMC.

bailor. *See generally Smalich v. Westfall,* 440 Pa. 409, 413, 269 A.2d 476, 480 (1970); 8A Am Jur.2d Bailments § 15 (2003).

The dispositive issue in this appeal concerns the nature of the interest conferred upon AFMC in this arrangement, and, relatedly, the character of the interest reserved to Pioneer. Mechanically, Pioneer and AFMC executed a loan and security agreement and a three-party agreement (with Bank One), thus facially establishing the framework of a debtor/creditor relationship. Pioneer agreed to arrange for the notes to be endorsed and shipped to AFMC, along with a bailee letter indicating that Pioneer held a security interest in the notes and their proceeds, and also, retained title pending full payment.[6] AFMC, in turn, was to consummate the sale to an institutional investor, and Pioneer was to be paid from the proceeds. Additionally, RNG committed to obtaining approval of this arrangement from the federal bankruptcy court supervising its operations.[7]

RNG assembled the first loan portfolio to be administered in this manner, worth approximately $2.3 million, in mid-October of 1997. AFMC proceeded to obtain a purchase commitment from Norwest Funding, Inc. ("Norwest"), an institutional investor that had categorically refused to purchase loans directly from RNG. In connection with the purchase, Norwest required a series of seller representations and warranties, including AFMC's attestation to its absolute and unencumbered ownership of the notes, which facially contradicted the bailee letter transmitted from Pioneer to AFMC. The notes were released to AFMC, endorsed by it, and shipped by AFMC to Norwest.[8] After reviewing the notes, Norwest subsequently transferred payment for those that it accepted via the Federal Reserve Wire Transfer Network ("FedWire") to an AFMC account maintained with Appellant, CoreStates Bank, N.A. ("CoreStates"),[9] which had been de-

---

**6.** Pioneer also obtained personal guarantees from AFMC's principal, Thomas Flatley, as well as RNG's principal.

**7.** Parenthetically, RNG failed to obtain this approval as promised.

**8.** The parties maintain a factual dispute concerning whether or not AFMC also forwarded the bailee letter to Norwest. Resolution of this dispute is not material to our disposition of the appeal, infra.

**9.** In April of 1998, CoreStates merged with First Union National Bank, which became the successor-in-interest to its position in this litigation.

nominated by AFMC as a "settlement account." Upon AFMC's request, CoreStates forwarded the funds to Bank One, to the credit of Pioneer's designated account.

After the first transaction, Pioneer expressed concern about AFMC's possession of the proceeds from the loan sales and requested that AFMC instruct Norwest to transmit proceeds from future sales directly to Pioneer's account at Bank One. Representatives of Pioneer, RNG, and AFMC all contacted Norwest to convey Pioneer's request.

As it turns out, Pioneer's concern was well founded, since, unbeknownst to it or AFMC, CoreStates was beginning an investigation of account activity of corporations in which AFMC's principal, Thomas Flatley, had an interest. The bank had discovered a substantial overdraft in an AFMC account, in the amount of approximately $4.5 million, and, as a result of its investigation, concluded the overdraft was a consequence of a sustained practice of check kiting, *i.e.*, improper manipulation of accounts to allow the account holder to draw on funds that it did not in fact possess.[10] In response, on November 7, 1997, CoreStates imposed debit restraints on Flatley company accounts, including the AFMC settlement account.

Without knowledge of this debit restraint, RNG, Pioneer, AFMC, and Norwest proceeded with the sale of a second portfolio of loans to Norwest, this time valued at approximately $1.78 million, which occurred during the second week of November, 1997. The second transaction initially proceeded much as the first one had. Contrary to Pioneer's expressed wishes, and despite the request that AFMC had previously conveyed on Pioneer's behalf, AFMC again furnished instructions to Norwest to wire the proceeds of the sale to AFMC's self-described settlement account at CoreStates. Norwest complied with those instructions and transmitted the approxi-

For convenience, we will refer to the Appellant as CoreStates throughout.

10. Pursuant to a cash management agreement with CoreStates, funds accumulated in any of AFMC's accounts could be used to cover checks drawn on other accounts. However, the series of overdrafts resulting in AFMC's ongoing indebtedness of $4.5 million was well beyond the scope of such agreement.

mately $1.78 million to this account via FedWire in three installments. These funds became frozen as a result of CoreStates' debit restraint, and CoreStates refused requests from the various parties to either return the monies to Norwest or to forward them to Pioneer's account at Bank One.

■ Later that month, CoreStates consulted a specialist in banking law in connection with the AFMC overdrafts. The attorney advised the bank that it had the right to set off monies credited to AFMC deposit accounts against the overdraft indebtedness.[11]  CoreStates subsequently swept and closed AFMC's accounts, including the settlement account, making corresponding entries in its books to afford AFMC credit against its indebtedness.  In the ensuing months, CoreStates negotiated repayment terms with Mr. Flatley for the remainder of the indebtedness, which culminated in a workout agreement executed in March of 1998.

Pioneer, for its part, would no longer fund RNG, and RNG ceased doing business.  Although Pioneer never received payment in relation to the second loan portfolio, it satisfied its own indebtedness to Bank One. Apparently as a result of a downward spiral triggered by its substantial losses in this regard, however, Pioneer itself ceased doing business in the summer of 1999.

■ Pioneer commenced the present civil action against CoreStates, AFMC, Flatley, and Norwest, in 1998.  The primary claim against CoreStates was grounded in a theory of conversion,[12] and Pioneer also sought punitive damages.  In

11.  A bank's right of setoff arises under common law, subject to requirements of mutuality of obligation, maturity, deposit in a general account, and depositor ownership.  *See Royal Bank of Pa. v. Selig*, 434 Pa.Super. 537, 546, 644 A.2d 741, 744 (1994).  It is undisputed that the first three of these four elements were met; the depositor ownership element, however, is a central subject of the remaining controversy.

12.  An obstacle to the assertion of a claim of conversion against a bank exercising a right of setoff of the proceeds of a general deposit account arises out of the debtor/creditor relationship between the bank and the account holder.  Among the essential elements of conversion is an absence of owner consent.  *See Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964) (setting forth the

the pretrial proceedings, Corestates unsuccessfully sought dismissal of the action and, subsequently, summary judgment. Among other theories, CoreStates invoked decisional law holding that a bank's common law right of setoff has priority over a perfected security interest in collateral.[13] *See Pennsylvania Nat'l Bank & Trust Co. v. CCNB Bank N.A.*, 446 Pa.Super. 625, 630–32, 667 A.2d 1151, 1154–55 (1995), *limited appeal allowed*, 544 Pa. 195, 675 A.2d 1209 (1996).[14] Pioneer, on the other hand, relied substantially on a line of cases vindicating the interests of third-party owners over a bank's right of setoff, where the account holder possesses the third-party

elements of a conversion claim). As a general rule, however, general deposit account proceeds are treated as property of the bank, with account balances representing the bank's indebtedness to the depositor. *See Thomas v. First Nat'l Bank of Scranton*, 376 Pa. 181, 184, 101 A.2d 910, 911 (1954). Thus, at least in the usual case, owner consent will be inherent in the act of bank setoff. *See generally* 14 Causes of Action 105 § 3 (2004); 1 Thomas D. Crandall, Richard B. Hagendorn, and Frank W. Smith, The Law of Debtors and Creditors § 5.12 (2004) ("The action against a bank for improper setoff should lie in breach of contract, as opposed to the tort of conversion."). Conversion theory, however, has been invoked in other jurisdictions as a means of vindicating third-party ownership interests in certain identifiable account proceeds. *See, e.g., Citizens Nat'l Bank v. Mid–States Dev. Co.*, 177 Ind.App. 548, 380 N.E.2d 1243, 1248–50 (1978); *cf.* 14 Causes of Action 105 § 3 (2004) ("A conversion action is clearly proper where the plaintiff is alleging that the funds set off by the bank comprised a deposit for a special purpose."). *See generally* Dag Wilkinson, *Third–Party Interests in Deposit Accounts and the Bank's Right of Setoff*, 109 Banking L.J. No. 3 (May–June 1992) ("A bank improperly exercising setoff, in violation of a third-party interest in a deposit account, may open itself up to an action for conversion, including claims for attorney fees and possible punitive damages.").

In light of our disposition, below, we need not proceed further with an analysis of the appropriateness of conversion theory to Pioneer's averments in this case, which, in any event, is beyond the scope of the questions framed by CoreStates for our review in its statement of questions involved. *See* Pa.R.A.P. 2116(a).

13. Under the Uniform Commercial Code, as reflected in the Pennsylvania Commercial Code, perfection of a security interest is maintained in identifiable proceeds upon the sale of collateral. *See* 13 Pa.C.S. § 9315(a)(2). Whether proceeds are capable of identification is determined according to common law tracing rules. *See id.* cmt. 3. Here, the proceeds from the sale of the second loan portfolio to Norwest remained clearly identifiable, by virtue of CoreStates' debit restraint.

14. The discretionary appeal allowed by this Court in *Pennsylvania National Bank & Trust* was subsequently discontinued without opinion.

funds strictly as a fiduciary or agent. *See, e.g., Sherts v. Fulton Nat'l Bank*, 342 Pa. 337, 340–41, 21 A.2d 18, 20 (1941).[15]

The trial court, however, took the view that such distinctions, and other principles of commercial law arising under the Pennsylvania Commercial and Banking Codes, were of little or no relevance to this case, primarily on the basis that Pioneer had grounded its action in the tort of conversion as opposed to commercial law. *See, e.g.,* N.T., June June 30, 2000 (a.m.), at 6 ("The action ... is not in contract. It's absolute tort. Therefore, the UCC ... do[es] not apply to this case. That applies only to contract actions."). Accordingly, as the case proceeded through trial,[16] the trial court refused CoreStates' request for a directed verdict grounded in these principles and its proposed jury instructions embodying them. Instead, the trial court issued a relatively short set of instructions that did not differentiate between (and indeed conflated) possession by a fiduciary or agent subject to another's absolute reservation

15. *Accord* 9 C.J.S. Banks and Banking § 309 (2004) ("Where the money deposited does not belong to the depositor, a set-off by the bank is improper, at least where the bank has notice of the third party's interest."). Application of the *Sherts* precept does not necessarily require that the third-party funds be reposited in a special or restricted account. *See, e.g., Ryan Bros., Inc. v. Curwensville State Bank*, 382 Pa. 248, 254–55, 114 A.2d 178, 181 (1955). Moreover, the parties devote substantial argumentation to the question of the timing of CoreStates' setoff, given that CoreStates' knowledge concerning the source of the AFMC funds increased over time in the period between its initial receipt of the sale proceeds from Norwest and the sweeping of the accounts (this discussion is centered on the application of the doctrine of automatic setoff, *see generally Selig*, 434 Pa.Super. at 545, 644 A.2d at 744). It is clear, however, that from the outset, CoreStates was aware that AFMC had denominated the relevant account a "settlement account"; this in and of itself is sufficient to trigger at least further inquiry under the *Sherts* line. *See Ryan Bros.*, 382 Pa. at 254–55, 114 A.2d at 181 (characterizing a plaintiff's case for resisting bank setoff under *Sherts* as particularly strong, where actual ownership was invested in the third-party plaintiff, and the account had been labeled a "distribution account"). Therefore, the focus of our analysis in this case is on the ownership, rather than the timing, aspect.

16. Trial proceeded with Pioneer as the sole plaintiff (Bank One discontinued its claims prior to trial), against CoreStates, AFMC, and Flatley, with Pioneer settling its claims against Norwest immediately prior to trial.

of title (a true trust or bailment arrangement and the *Sherts* paradigm) and a perfected security interest in account proceeds (the *Pennsylvania National Bank & Trust* scenario). The court then described Pioneer's essential claim as an assertion of a security interest in the AFMC account proceeds, and relegated CoreStates' defenses to the claim that Pioneer simply had no security interest.[17] Having reduced the issue to be decided by the jury to the single question of whether or not Pioneer possessed a security interest, the trial court advised the jurors that, if they answered this question in the affirmative, CoreStates had no right to set off and could be found liable for conversion.[18] Additionally, the court issued a generalized punitive damages charge.

In the context of the court's charge, the jury returned a special verdict finding that Pioneer possessed an ownership interest in the funds deposited in the AFMC settlement account. The jurors thus found Corestates and AFMC liable in conversion, and awarded Pioneer the $1.78 million sum that CoreStates had set off.[19] The jury also found Corestates (but not AFMC) liable for punitive damages, and, after a damages phase of trial, awarded Pioneer an additional $13.5 million in consequential damages (the amount by which its market capitalization had declined between the date of setoff and the date of trial), and set the punitive damages award at $337.5 million.

17. Although this certainly was one of CoreStates' defenses (arising from RNG's failure to obtain bankruptcy court approval of the Pioneer/AFMC/RNG transaction, *see supra* note 7), as previously indicated, CoreStates had plainly advanced, *inter alia*, the alternative position that even if Pioneer's interest in the account funds constituted a perfected security interest, prevailing Pennsylvania law afforded priority to its right of setoff. *See Pennsylvania Nat'l Bank & Trust*, 446 Pa.Super. at 630–32, 667 A.2d at 1154–55.

18. The trial court also charged that CoreStates could be liable for conversion if the AFMC settlement account constituted a special or restricted, as opposed to a general, account. *See generally Royal Bank of Pa. v. Selig*, 434 Pa.Super. 537, 546, 644 A.2d 741, 745 (1994). The jury, however, returned a finding that the account was general in character, and this finding is not at issue in the present appeal.

19. The trial court also had directed a verdict against AFMC and Flatley for this sum based on a contract theory.

In response to post-trial motions by Corestates, the trial court sustained the liability findings and the compensatory damages award, but remitted the punitive damages to $40.5 million, resulting in a judgment in favor of Pioneer in the amount of approximately $56 million. In an opinion accompanying its order, the court reiterated its view that the Pennsylvania Commercial and Banking Codes were inapplicable, since Pioneer's claim arose in tort. *See Pioneer Commercial Funding Corp. v. American Fin. Mortgage Corp.*, 50 Pa. D. & C.4th 31, 46 (C.P.Phila.2000). Further, as in its instructions to the jury, the court also continued to conflate the concept of a security interest with absolute ownership, at various points describing the jury's finding as confirming Pioneer's absolute title to the funds, *see, e.g., id.* at 35 ("In the view of Pioneer, supported by this jury's verdict, Pioneer enjoyed the exclusive right of ownership in the sums ... wired into AFMC's account."), and at others indicating that the jury's finding of ownership was based on the presence of a perfected security interest. *See, e.g., id.* at 42–43 ("The plaintiffs correctly characterize this ownership interest as a 'perfected security interest' vesting rights independently in Pioneer."). The court at no time cited or discussed the relevance of *Pennsylvania National Bank & Trust* (which was again highlighted by CoreStates in the post-trial briefing), in light of its acknowledgement that the jury's determination of ownership was based entirely on a finding of a secured status.

Pioneer did not appeal the remittitur, but Corestates lodged an appeal in the Superior Court, where a divided panel affirmed as to liability, but awarded a retrial on the issue of punitive damages. *See Pioneer Commercial Funding Corp. v. American Fin. Mortgage Corp.*, 797 A.2d 269 (Pa.Super.2002). With regard to CoreStates' position that the trial court conflated the absolute-title-retention versus sale-on-credit paradigms, the majority stated as follows:

The jury ... did not confuse any interests which AFMC may have had in the Fund with Pioneer's interest. The jury's understanding was clearly shown in its affirmative answer to the following question: "Do you find that plaintiff

Pioneer Commercial Funding Corporation had an ownership interest in the funds wired by Norwest to American Financial Mortgage Corporation's settlement account at defendant CoreStates Bank that entitled plaintiff to possession of the funds?"

*Id.* at 284. The majority did not squarely address CoreStates' contention that the trial court's instructions did not appropriately frame the ownership question; in this respect, it merely characterized CoreStates' argument as nothing more than an invitation to read isolated portions of the jury charge out of their appropriate context. *See id.*[20]

We allowed CoreStates' subsequent appeal, in which it has maintained, *inter alia*, that the jury's verdict was tainted by the common pleas court's decision to depart from prevailing principles of commercial law on the basis that such precepts lack relevance to a tort action grounded in conversion theory.

■■ It is apparent from the outset that CoreStates' position in this regard has merit. As noted, the present matter at its core embodies a commercial priority dispute. Pioneer's styling of the action under the rubric of conversion did not undermine the relevance of governing principles of commercial law, since a claim of conversion cannot be sustained in the face of lawful justification on the part of the asserted tortfeasor. *See Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964) ("A conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent *and without lawful justification.*" (citation omitted)).[21] The trial court's ruling that tenets of commercial law were irrelevant improperly relieved Pioneer of establishing an es-

**20.** Judge Beck dissented, concluding that Pioneer's conversion claim was preempted by the fund transfer provisions of the Pennsylvania Commercial Code, 13 Pa.C.S. §§ 4A101–4A507, discussed infra.

**21.** Identifiable funds are deemed a chattel for purposes of conversion. *See, e.g., McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n. 3 (Pa.Super.2000); *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 879 (Pa.Super.1997).

sential element of its case (the absence of lawful justification), and wrongfully stripped CoreStates of relevant defenses.[22]

Furthermore, the case was submitted to a jury lacking essential direction. Because of the trial court's approach, the jury never learned of the relevant distinction under Pennsylvania law between the *Sherts* scenario, involving pure fiduciary or agency relationships entailing absolute retention of title, and a sale-on-credit transaction. Indeed, the trial court misled the jury by affirmatively indicating, contrary to the holding of *Pennsylvania National Bank & Trust*, that a security interest created a sufficient ownership interest to defeat a bank's right of setoff.[23]

The Superior Court majority's view (that the jury's finding of ownership in Pioneer demonstrated that it understood the distinction between absolute ownership and security interests) is unsupportable, since the jury repeatedly was told by the trial court that a security interest constituted a sufficient ownership interest to support liability. Furthermore, its suggestion that such admonitions were isolated ones is not defensible—they were in fact the sum and substance of the trial

**22.** The trial court was correct only to the extent that its ruling reflected the principle that, under prevailing Pennsylvania law, the Uniform Commercial Code did not supply the relevant priority rule. *See Pennsylvania Nat'l Bank & Trust*, 446 Pa.Super. at 631, 667 A.2d at 1154. It was not justified, however, in utilizing this principle to discount the relevance of the Uniform Commercial Code generally (for example, in the initial assessment of the character of Pioneer's interest at issue), or to diminish the relevance of other principles of commercial law as they pertained to the lawfulness of CoreStates' conduct.

**23.** The trial court also was not wholly incorrect in its understanding that a security interest, in the broadest sense, carries with it ownership attributes. *See, e.g.,* Thomas W. Merrill & Henry E. Smith, *The Property/Contract Interface*, 101 Colum. L.Rev. 773, 834–35 (2001) (describing the property and contractual aspects of a security interest). The trial court's mistake was in not apprehending that it is not the type of interest that had been deemed, under Pennsylvania law, to be sufficient to defeat a bank's right of setoff. On this point, the trial court was not free to attempt to write on a clean slate. *See, e.g., In re Townsend's Estate*, 349 Pa. 162, 168, 36 A.2d 438, 441 (1944) (stating the precept that common pleas courts are bound by decisions of the intermediate appellate courts, in absence of a pronouncement by this Court on the subject matter of the decision).

court's description of the governing law in its liability instruction.

In its brief, Pioneer contends that *Pennsylvania National Bank & Trust* is not persuasive, and therefore, this Court should take this opportunity to overrule it. First, Pioneer argues that its analysis of the priority question is *dictum*, because the bank asserting its right of setoff "apparently" had previously relied on the deposit as security in making a loan to the debtor. This asserted fact, however, is neither apparent on the face of the *Pennsylvania National Bank & Trust* opinion nor is it any part of the Superior Court's express reasoning; therefore, we do not deem it a proper basis to displace the court's holding. Second, Pioneer takes the position that the case should be limited to its facts, as it involved bank setoff in relation to a certificate of deposit as opposed to a deposit account. The certificate of deposit at issue, however, was of the non-negotiable variety, which has been held to constitute a general deposit account under the prior version of the Uniform Commercial Code, *see, e.g., In re Alabama Land and Mineral Corp.,* 292 F.3d 1319, 1324–25 (11th Cir.2002), and notably, this treatment has been made express under the revised Uniform Commercial Code. *See* 13 Pa.C.S. § 9102, cmt. 12 (stating that "[t]he revised definition [of deposit account] clarifies the proper treatment of nonnegotiable or uncertificated certificates of deposit," and observing that, unless of a type subject to transfer by delivery only without endorsement or assignment, a non-negotiable certificate of deposit is a deposit account).[24] Moreover, the *Pennsylvania*

24. Pioneer also invokes a prior Superior Court decision, *Middle Atlantic Credit Corp. v. First Pa. Banking and Trust Co.,* 199 Pa.Super. 456, 185 A.2d 818 (1962), as establishing the appropriate priority of a perfected-secured creditor over a bank exercising a right of setoff. Although certainly there is language in *Middle Atlantic* supporting Pioneer's position, the case concerned a factoring relationship in which the funds in issue had been assigned to the plaintiff, and the holding was expressly grounded in the *Sherts* decision pertaining to funds held in trust. *See Middle Atlantic,* 199 Pa.Super. at 457–58, 185 A.2d at 819. Additionally, as Pioneer's argument acknowledges, *Pennsylvania National Bank & Trust* represents the more recent decision on the priority accorded to bank setoff. Notably, since rendering the decision, the Superior Court has continued to frame its holding in broad terms. *See,*

*National Bank & Trust* court obviously viewed non-negotiable certificates of deposit and deposit accounts as being of the same order, since it predicated its decision on a series of decisions involving bank setoff of deposit accounts. *See Pennsylvania Nat'l Bank & Trust,* 446 Pa.Super. at 629–31, 667 A.2d at 1154 (citing, *inter alia, Pittsburgh Nat'l Bank v. United States,* 657 F.2d 36, 38 (3d Cir.1981); *Selig,* 434 Pa.Super. at 537, 644 A.2d at 744; *Aarons v. Pub. Serv. Bldg. & Loan Ass'n,* 318 Pa. 113, 178 A. 141 (1935)).

We appreciate the complexity of the priority issue resolved in *Pennsylvania National Bank & Trust,* and acknowledge the strong equities attaching to each of the competing interests as between banking institutions and companies funding purchase transactions in general commerce. We are also aware that the *Pennsylvania National Bank & Trust* panel afforded little in the way of concrete explanation concerning the balance that it struck in devising a common law priority rule.[25] To some degree, the inability to fully rationalize a

e.g., *Commercial Nat'l Bank, of Pa. v. Seubert & Assoc., Inc.,* 807 A.2d 297, 308 (Pa.Super.2002) ("In *Pennsylvania Nat'l Bank and Trust Co.,* we affirmed the trial court's grant of summary judgment and held that the common-law setoff right gave the bank a right to self-help that took priority over other creditors claiming a right to the funds.").

25. Prior to 1998 amendments to the Uniform Commercial Code, there was in fact a fairly strong current in a number of other jurisdictions favoring the interests of secured creditors over depository institutions, based on the general priority provision of Article 9. *See* Pa.C.S. § 9201(a) ("Except as otherwise provided by this Act, a security interest is effective according to its terms between the parties, against purchasers of the collateral and against creditors."). *See generally* Annotation, *Effect of UCC Article 9 Upon Conflict, As to Funds in Debtor's Bank Account, Between Secured Creditor and Bank Claiming Right of Setoff,* 3 A.L.R.4th 998 (2004) (collecting cases); Janet A. Flaccus, *Banks Against Secured Parties To The Victors Go The Spoils,* 6 U. MIAMI BUS. L.J. 59, 59 (1997) (observing that "the priority battle between banks claiming an interest not created under Article Nine and secured parties has split the courts"). The contrary line of cases generally relied on the exclusion of prior UCC Section 9–104(i) (excluding from the coverage of Article 9 a transfer of any "deposit, savings, passbook, or like account with a bank, savings and loan association, credit union, or like organization"), to exempt setoff from consideration under Article 9 entirely and to interpose a common law priority rule. *See id.; see also* Annotation, *Effect of UCC Article 9 Upon Conflict, As To Funds In Debtor's Bank Account, Between Secured Creditor And Bank Claiming Right Of Setoff,* 3

particular priority structure is inherent in the nature of the undertaking—it is perhaps best conceptualized as an attempt to establish a framework pursuant to which parties can organize their financial dealings on a prospective basis with a fair degree of predictability. As such, and given the range and scale of interests involved, the exercise is far more amenable to legislative determination than to common law decision making. Indeed, as Pioneer acknowledges, legislative intervention did in fact occur—in 1998, the Uniform Commercial Code was revised to embrace the *Pennsylvania National Bank & Trust* holding, *see* 13 Pa.C.S. § 9–340(a) (establishing the general rule that "a bank with which a deposit account is maintained may exercise any right of recoupment or set-off against a secured party that holds a security interest in the deposit account"), which has since been adopted in fifty states.[26]

Thus, the Pioneer/AFMC arrangement for sale of the second loan portfolio to Norwest was orchestrated at a time when Pennsylvania's common law matched the Uniform Commercial Code's present, statutory priority scheme, and, as reflected in that scheme, and taking due consideration of the respective interests involved, the common law priority scheme was at least a reasonable one. In these circumstances, we do not believe that the interests of justice require further evaluation of the potential for retrospectively modifying the now-supplanted common law to consider the wisdom of a closed-ended departure from current practice.

■ In summary, under prevailing Pennsylvania law as it existed at the time of trial, the controlling question in this case

A.L.R.4th 998 § 1 (1981); Flaccus, *Banks Against Secured Parties*, 6 U. MIAMI BUS. L.J. at 64.

**26.** *See generally* 1 CLARK, THE LAW OF SECURED TRANSACTIONS ¶ 1.08[9][c] ("Rev. UCC § 9–340 . . . changes prior law in most states by giving priority to a bank's right of setoff over a security interest in a deposit account claimed by another creditor."); 11 LARRY LAWRENCE, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9–340:4R (2003) (observing that, under the revised UCC, "the bank may set off a debt owed to it by the debtor even though another secured party also has a security interest in the account"). The statutory amendment was effectuated in Pennsylvania in 2001.

should have been whether Pioneer effectuated an absolute reservation of title in the second loan portfolio and its proceeds (i.e., a true bailment), versus whether it possessed a perfected security interest (or something of lesser priority). Since the common pleas court failed to make this distinction, at a minimum, the verdict must be vacated and the case returned for a new trial.

CoreStates also seeks review of the trial court's decision to deny it judgment notwithstanding the verdict on the ground that, as a matter of law, Pioneer's interest should be relegated, at most, to the security-interest category. In this undertaking, we review the record in the light most favorable to Pioneer to assess whether its evidence was sufficient to sustain the bailment theory. *See Adamski v. Miller*, 545 Pa. 316, 319, 681 A.2d 171, 173 (1996).

As a threshold matter, we recognize that Article 9 of the Uniform Commercial Code was conceived with the goal of minimizing the role of actual, technical title in the governance of commercial transactions. *See generally* 13 Pa.C.S. § 9202 (stating the general rule that the provisions of Article 9 "apply whether title to collateral is in the secured party or the debtor"); Charles W. Mooney, Jr., *The Mystery and Myth of 'Ostensible Ownership' and Article 9 Filing*, 39 ALA. L.REV. 683, 789 n. 275 (1988) ("one of the basic conceptual underpinnings of Article 9[is] the unification of treatment of all secured transactions that have the same economic effect without making unnecessary distinctions based on the form of the transaction or the location of 'title.' "); 9B HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 9–202:1. Significantly, parties are not constrained, however, in all instances to conduct their affairs under the Uniform Commercial Code's regime; for example, a true bailment relationship (a directed-purpose transfer to an agent of possession only, subject to absolute retention of title), is not covered by Article 9. *Accord* 8 HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 9–102:3 (citing *Rohweder v. Aberdeen Prod. Credit Ass'n*, 765 F.2d 109, 112 (8th Cir.1985)). In distinguishing between transactions gov-

erned by the Uniform Commercial Code versus those con-trolled by other law (here, a sale on credit versus a true bailment), the intention of the parties is obviously the preeminent consideration. To assess intent, courts will look not to any particular document or the form of the transaction, but rather, to the overall transaction and its substance. *See generally* 13 Pa.C.S. § 9–102, cmt. 3b.[27]

In the present case, Pioneer, RNG, and AFMC participated in an unusual transaction designed to invest in AFMC the accouterments of ownership vis-à-vis the second loan portfolio. The undisputed objective was to satisfy Norwest's condition that it have a right of recourse against the seller. Although the transaction was unique, it was nevertheless organized around a loan and security agreement, the cornerstone of a UCC-based security relationship, *see* 13 Pa.C.S. § 9201, the notes were endorsed to AFMC, AFMC in turn endorsed the notes as the sole party entitled to their enforcement, and the transaction was held out to third parties as a sale with the knowledge of all concerned. The situation is in no way akin to that which was present in *Sherts*, namely, setoff of an attorney's deposit account containing proceeds from receivables belonging to third-parties. *See Sherts*, 342 Pa. at 338–39, 21 A.2d at 19. The overall structure of the transaction, therefore, militates strongly in favor of treating the transaction as a sale on credit, subject to a security interest.[28]

27. *Cf.* 1 CLARK, THE LAW OF SECURED TRANSACTIONS ¶ 1.03[1] ("Since the key to coverage under Article 9 is *intent* to create a security interest, and since substance rules over form, the courts will look through a transfer absolute in form to find a secured transaction if that was the real intent of the parties."). These sorts of questions frequently arise in the Article 2 context in terms of sale versus leasing arrangements. *See, e.g.,* 1 THOMAS D. CRANDALL, RICHARD B. HAGENDORN, AND FRANK W. SMITH, JR., THE LAW OF DEBTORS AND CREDITORS § 7:22 (2004); 8 HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 9–102:3; BANKRUPTCY SERVICE LAWYERS EDITION § 49:243 (2004).

28. In rejecting the possibility of a sale scenario, the trial court placed substantial emphasis on the fact that Pioneer did not receive contempo-raneous payment from AFMC. *See, e.g.,* N.T., June 7, 2000 (p.m.), at 42 ("An ownership interest vests only upon payment."). The trial court's view, however, overlooks the myriad possibilities for styling a sale-on-credit transaction. It is also worth referencing the value accruing to AFMC for entering into such a relationship, in terms of maintaining

The strongest evidence of an intention on the part of Pioneer to retain absolute title is reflected in the bailee letter.[29]  As noted, the bailee letter is a standard, commercial device designed to assure continued perfection of a security interest, *see supra* note 5; *see also* 2 CLARK, THE LAW OF SECURED TRANSACTIONS ¶ 7.08[2][b] ("By use of the bailee letter, [the warehouse lender] retains its perfected security interest in the third-party notes by a form of constructive possession."); it is not designed to create a true or pure bailment relationship.  Moreover, in the circumstances presented, the assertion in the bailee letter of an absolute retention of title is inconsistent with the overall structure of the transaction—indeed, if it were to have been enforced, the proviso would have wholly undermined the sale of the second loan portfolio on the designated terms.  We therefore agree with CoreStates that to permit a factfinder to regard the trust proviso of the bailee letter as dispositive would afford too little recognition to the other documents and the overall character of the transaction.  We also view the similar characterizations of the transaction by Pioneer's lay witnesses at trial as insufficient to overcome the understanding arising from the undisputed structure and purpose of the transaction.[30]

Accordingly, based on the evidence viewed in the light most favorable to Pioneer, we hold as a matter of law, that the transfer of the second loan portfolio to AFMC was in the nature of a sale-on-credit transaction, subject to a security interest, as opposed to a true bailment.  As such, the case need not be returned for fact finding on this subject.

RNG's status as a going concern and, concomitantly, AFMC's ability to benefit from RNG's assets via an acquisition.

29.  Of course, as CoreStates emphasizes, Pioneer had never formally been inserted into the chain of title;  however, it (and/or Bank One as its agent) did maintain the notes in bearer form at the time the bailee letter was transmitted to AFMC.

30.  Pioneer did offer testimony from an attorney, but it was presented as fact evidence—Pioneer offered no testimony from a qualified expert witness in the liability proceedings.  Although CoreStates does not frame the matter on such terms, the absence of expert testimony to aid the jury in making the essential distinction between the various commercial relationships represents another substantial deficiency in Pioneer's position.

In considering whether there is any other reason to return the matter for a jury determination, we observe that the case had many facets. For example, the parties maintain a vigorous dispute concerning whether Norwest's transfer of the proceeds from the sale of the second loan portfolio to the AFMC account occurred by design or mistake. Along another line, the trial court's opinion is replete with criticisms of CoreStates' conduct giving rise to the litigation. *See, e.g., Pioneer*, 50 Pa. D. & C. 4th at 34–35 (stating that "CoreStates, in a desperate attempt to recoup its negligently incurred losses, seized the funds pursuant to its alleged right of set-off"); *id.* at 35 (indicating that "AFMC and Thomas Flatley entered into a workout agreement with the bank whereby the parties conspired to keep Pioneer's money and to keep the matter secret."). Although the case was not originally framed by the trial court for the jury determination to depend on such considerations, the question arises whether they may be relevant to the case as it could or should have been framed.

On the matter of CoreStates' conduct, it is significant that Pioneer did not undertake in the liability proceedings to establish any prevailing standards in the banking community that would support the characterization of the bank's conduct as negligent. This sort of perspective on the case, therefore, appears to arise more from a visceral reaction based on generalized notions concerning the relative equities of the parties' positions than from an application of governing legal principles. In this regard, although CoreStates' act of setting off the AFMC account was aggressive, particularly in light of the character of the underlying debt owed to it by its depositor, it simply did not exceed the limits of existing law. Similarly, the fact that CoreStates entered into a confidential agreement with Flatley to satisfy AFMC's remaining indebtedness after the setoff does not serve as a predicate for liability in conversion.

Regarding the aspect of whether or not the transfers to the AFMC settlement account occurred by mistake, there was some conflict in the evidence presented at trial, and therefore, fact finding would be implicated if the question were material

to the outcome of the case. We conclude, however, that it is not. In terms of the lawful justification for its conduct, CoreStates was not bound by any particular party's characterization of the transfer as mistaken. At most, the bank was on inquiry notice of a potential third-party interest (*inter alia* by virtue of AFMC's denomination of the relevant account as a "settlement account," *see supra* note 15), and was therefore bound to conduct a reasonable investigation. The undisputed evidence, however, is that CoreStates did, in fact, conduct that investigation, and, in the course of it learned of the transaction structured by Pioneer, RNG, and AFMC. Corestates thus discovered the facts underlying our conclusions that AFMC had been placed into the chain of title with respect to the second loan portfolio, and that Pioneer possessed at most a perfected security interest. Further, Corestates learned that AFMC had instructed Norwest to transfer the proceeds from the sale of the second loan portfolio to its settlement account. In view of these circumstances, the fact that Pioneer desired to be paid directly by Norwest, or even that Norwest may have at various junctures undertaken some post-transfer efforts to vindicate Pioneer's position in this regard,[31] does not represent the kind of error or mistake that would give rise to bank liability in conversion for wrongful setoff. *Cf.* 2 CLARK, THE LAW OF SECURED TRANSACTIONS § 7.08[2][b] (noting that the bailee-with-notice concept does not eliminate the risk that an investor will tender payment to a loan originator as opposed to the warehouse lender).[32]

---

**31.** Pioneer presented evidence that, acting at Pioneer's behest, Norwest personnel did at one point make an ineffectual attempt to reverse the transfers as mistaken, although Norwest representatives maintained the position throughout trial that the transfers occurred in due course, according to the instructions of its business correspondent, AFMC.

**32.** Parenthetically, we note that such considerations would not likely relieve various other parties to the transaction from liability to Pioneer, including Norwest (which settled with Pioneer and whose ability to retain the collateral free and clear of Pioneer's interest would likely have depended, at least in part, on its prior knowledge of that interest, *see* 13 Pa.C.S. §§ 3302, 3306), AFMC and Flatley (who suffered judgment at trial), or RNG's principal (who had executed a personal guarantee in favor of Pioneer).

Having considered these and other facets of the case, we conclude that a new trial is not implicated.[33]

Finally, we observe that CoreStates has raised a number of other important legal issues in this appeal. Most significantly, the framing of the case in terms of Article 4A of the Uniform Commercial Code and the incorporating provisions of Federal Reserve Board Regulation J, 12 C.F.R. 210.25(a), (b), governing fund transfers, has attracted the attention of multiple *amici*, including the Federal Reserve Banks. In this regard, CoreStates has maintained throughout the litigation that Article 4A's express authorization of bank setoff, *see* 13 Pa.C.S. § 4A502(c) (providing, *inter alia*, that "the amount credited [via wire transfer] may be set off against an obligation owed by the beneficiary to the bank"), as incorporated into Regulation J, preempts common law distinctions based on ownership or secured status external to Article 4A as they might otherwise pertain to the lawfulness of bank setoff. In this regard, CoreStates' position appears to encompass the assertion that the *Sherts* holding has been preempted (or at least substantially displaced) by statute. This, in turn, has given rise to concerns on the part of another *amicus*, whose interests are representative of a substantial body of persons and organizations that are beneficiaries of statutory trusts arising by operation of federal law, for example, in proceeds from the sale of perishable agricultural commodities. *See* 7 U.S.C. § 499e(c). This *amicus* presents the counter argument that Article 4A's setoff provision was intended to incorporate existing setoff and priority rules into the funds transfer arena, not to supplant them. Given our determination, above, however, there is simply is no conflict between Article 4A (or Regulation J) and Pennsylvania common law concerning any material point of the present dispute. Therefore, although we acknowledge the importance of this issue and the respective merits of

33. In light of our holding with respect to CoreStates' liability on the underlying cause of action for conversion, a new trial with respect to the issue of punitive damages is also not warranted. *See Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 101, 555 A.2d 800, 802 (1989) ("If no cause of action exists, then no independent action exists for a claim of punitive damage[s] since punitive damages [are] only an element of damages." (emphasis deleted)).

the competing positions, according to the general principles by which we address controversies, resolution will be reserved for a case in which the question would be of controlling significance.[34]

The order of the Superior Court is reversed and the matter is remanded for entry of judgment notwithstanding the verdict in favor of CoreStates.

Justice NEWMAN did not participate in the consideration or decision of this case.

---

**34.** Similarly, the parties' arguments frame a respectable debate regarding the scope of Pennsylvania's adverse claims statute, 7 Pa.C.S. § 606, according to the respective positions articulated by the Superior Court majority and dissent set forth in *E.F. Houghton & Co. v. Doe*, 427 Pa.Super. 303, 628 A.2d 1172 (1993).