5 A.3d 212

Rodger A. FREED, Appellee

v.

GEISINGER MEDICAL CENTER, and HealthSouth Corporation, Formerly known as HealthSouth Rehabilitation Corporation, and HealthSouth of Nittany Valley, Inc., t/d/b/a HealthSouth Nittany Valley Rehabilitation Hospital, Appellants.

Supreme Court of Pennsylvania.

Reargued Dec. 2, 2009.

Decided Sept. 29, 2010.

226

Kim Kocher, White and Williams, L.L.P., Philadelphia, Daniel Eric Lohr, Geisinger System Services, Danville, for Geisinger Medical Center.

Timothy J. MacMahon, John Jacob Hare, Marshall, Dennehey, Warner, Coleman & Goggin, P.C., Philadelphia, for HealthSouth Corporation.

Jan Sonja Barnett, for Rodger A. Freed.

George Gerasimos Rassias, Curran & Rassias, L.L.P., Media, for amicus curiae PA Trial Lawyers Association.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, GREENSPAN, JJ.

## *OPINION ON REARGUMENT*

Justice TODD.

The background of this matter, in which we granted reargument, is set forth in *Freed v. Geisinger Medical Center, et al.,* 601 Pa. 233, 971 A.2d 1202 (2009), wherein this Court affirmed the Superior Court's reversal of the trial court's grant of a compulsory nonsuit in favor of Defendants Geisinger Medical Center and HealthSouth Corporation (collectively, "Geisinger"). Therein, we addressed whether, as a matter of law, a nurse may testify in a negligence action that a breach of the nursing standard of care caused a plaintiff's medical condition. Ultimately, we held that an otherwise competent and properly qualified nurse is not prohibited by the Professional Nursing Law, 63 P.S. §§ 211 et seq., from giving expert testimony at trial regarding medical causation. In so holding, we overruled *sua sponte* our prior decision in *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183 (1997), wherein this Court had held a nurse was precluded from offering opinion testimony regarding the specific identity and cause of a medical condition because such testimony constituted a medical diagnosis, which a nurse is precluded from making under the Professional Nursing Law. In our original opinion, we concluded that *Flanagan* was inherently flawed because it applied a statute—the Professional Nursing Law—governing the specific practice of nursing to the distinct area of expert testimony in a court of law, which is governed by rules of evidence, rules of civil procedure, and common law rules regarding expert witnesses. We further

determined that our decision applied retroactively to the parties in the instant case, and, therefore, that the trial court should, on remand, assess the competency of plaintiff Rodger Freed's witness, a registered nurse, to testify regarding the relevant nursing standard of care and medical causation under the common law standards set forth in *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525 (1995), or the Medicare Availability and Reduction of Error Act ("MCARE Act"), if applicable.[1]

Geisinger filed a petition for reargument, asserting that this Court, in *sua sponte* overruling *Flanagan* and applying our decision retroactively, denied it its due process rights of notice and an opportunity to be heard. Geisinger further argued that, because Freed did not challenge the validity of *Flanagan* at trial or on appeal, or request that it be overruled, he waived any challenge to the validity of *Flanagan*. This Court recognized that, prior to overruling decisional law *sua sponte*, the interests of all parties are best served by allowing the participants an opportunity to present argument. Accordingly, we granted reargument to allow both parties to address the continued viability of *Flanagan*, as well as the question of any waiver of this issue. The parties fully briefed these points, and presented oral argument before this Court on December 2, 2009.

In its Supplemental Brief, Geisinger first argues that Freed waived any right to challenge the validity of this Court's decision in *Flanagan* because he did not raise or preserve his argument (a) before the trial court; (b) in his Statement of Matters Complained of on Appeal filed pursuant to Pa.R.A.P. 1925; (c) in his brief to the Superior Court; or (d) in his brief to this Court. Conversely, Freed argues that it is the trial court's Rule 1925(a) opinion that serves as the basis of appellate review, and because the trial court based its decision on

1. Justice Eakin filed a dissenting opinion, which was joined by Justice Saylor, wherein he opined that the *Flanagan* decision should not be overruled. Justice McCaffery did not participate in our original opinion.

*Flanagan,* the continuing viability of *Flanagan* is, at least implicitly, before this Court.

While we granted reargument, *inter alia,* on the issue of waiver, upon reflection, we conclude that consideration of traditional principles of waiver are inapt to the broader issue before us, namely, Geisinger's objection to this Court's *sua sponte* reconsideration and overruling of prior precedent. Thus, we turn to that question.

We begin by noting there have been numerous occasions in which this Court has *sua sponte* reconsidered and overruled prior precedent. *See, e.g., Commonwealth v. Collins,* 585 Pa. 45, 53–61, 888 A.2d 564, 568–73 (2005) (after *sua sponte* directing parties to brief issue of whether to modify approach to PCRA's previous litigation provision, Court revisited precedent and recognized that, in accordance with Supreme Court case law, a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of review under the PCRA); *Cimaszewski v. Bd. of Prob. & Parole,* 582 Pa. 27, 45, 868 A.2d 416, 427 (2005) (in light of United States Supreme Court case law, *sua sponte* reconsidering and overruling year-old decision in *Finnegan v. Pa. Bd. of Prob. & Parole,* 576 Pa. 59, 838 A.2d 684 (2003)); *Commonwealth v. Freeman,* 573 Pa. 532, 545–63, 827 A.2d 385, 393–403 (2003) (*sua sponte* abrogating capital direct appeal relaxed waiver doctrine); *Commonwealth v. Grant,* 572 Pa. 48, 67, 813 A.2d 726, 737–38 (2002) (*sua sponte* directing parties to brief continuing vitality of *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977), and then, in contravention to the parties' wishes, overruling that decision, noting "we have learned that time is necessary for a petitioner to discover and fully develop claims related to trial counsel ineffectiveness"); *Commonwealth v. Albrecht,* 554 Pa. 31, 45, 720 A.2d 693, 700 (1998) (*sua sponte* abrogating relaxed waiver doctrine in PCRA appeals, noting that its application "runs afoul of the very terms of the Post–Conviction Relief Act").

The concerns that support *sua sponte* reconsideration and overruling of prior precedent are several. First, parties are unlikely—understandably so—to ask for reconsideration of

what appears to be controlling precedent. Indeed, where parties are faced with precedent that appears unfavorable to their position, they are more likely to attempt to distinguish factually their case from the established precedent.

Further, parties before this Court generally are focused on the application of precedent to *their specific case.* In fact, the parties may not be aware of the impact or implication of the same precedent in cases involving different factual or procedural circumstances. Rather, it is this Court's function and responsibility to consider the broader picture, including the impact of precedent beyond the facts of an individual case, and the interplay between established precedent in varying areas of the law. The need for corrective action in cases such as *Albrecht, Grant, Freeman,* and *Collins* became apparent precisely because of this Court's problematic experience with settled doctrine.

Finally, there is no absolute jurisprudential bar to this Court's *sua sponte* reconsideration of precedent. As noted above, we have reconsidered prior decisions *sua sponte* on numerous occasions. The United States Supreme Court also has decided cases on grounds not argued in the lower courts or in the petitions for certiorari. *See, e.g., Arcadia v. Ohio Power Co.,* 498 U.S. 73, 77, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990) (deciding a question "antecedent . . . and ultimately dispositive" to the questions raised by the parties); *Citizens United v. Federal Election Comm'n,* —— U.S. ——, 130 S.Ct. 876, —— L.Ed.2d —— (Jan. 21, 2010) (overruling, *inter alia, Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), after having *sua sponte* remanded for supplemental briefing on the matter); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (overruling *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), without briefing or argument, and despite counsel expressly indicating he was not asking the Court to do so); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (overturning *sua sponte,* and without giving the parties an opportunity to brief or argue the issue, the

century-old precedent of *Swift v. Tyson*, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865 (1842)).

In the instant case, while neither party argued that *Flanagan* should be overruled, the vitality of that decision was antecedent to the issue raised by Geisinger, namely, whether the Superior Court properly determined that *Flanagan* was distinguishable from the instant case because it involved no medical diagnosis. Upon review, we determined that the Superior Court's decision was, indeed, in conflict with *Flanagan*. However, in reviewing and applying *Flanagan* to the facts of the instant case, the tension between *Flanagan* and the rules of evidence, the rules of civil procedure, and the common law pertaining to expert testimony became apparent. Accordingly, it was appropriate for this Court to examine the viability of *Flanagan* in rendering our decision. Furthermore, we have now provided both parties the full opportunity for briefing and reargument.[2] Of course, as we recognized and addressed in our original opinion, the ultimate determination of whether it is appropriate for this Court to overrule prior precedent depends on a number of factors, all of which are implicated under the doctrine of *stare decisis*. That doctrine, however, does not control the threshold issue of our authority to *sua sponte* address arguments which are clearly implicated in the cases before us.

Geisinger next argues that, if we are inclined to reassess the vitality of *Flanagan*, we should uphold it as valid precedent. Specifically, Geisinger argues that this Court erred in concluding in our original opinion that *Flanagan* had applied the Professional Nursing Law as a rule of evidence, instead of recognizing that *Flanagan* simply "held that the Professional Nursing Law defines the scope of competency of nurses in practice and, therefore, defines the scope of the competency of nurses to provide expert testimony." Appellants' Supplemental Brief on Reargument at 8. Geisinger further argues that *Flanagan* does not conflict with the normal liberal standard

2. In light of our conclusion, it is not necessary to address Freed's alternative arguments that any issue of waiver is moot, or should be excused for equitable reasons.

for competency, as we concluded in our original opinion, because *Flanagan* merely recognizes that, because a nurse is prohibited from making a medical diagnosis in practice, he or she would be unable to obtain the specialized knowledge necessary to allow her to testify in a court of law.

■ As we explained in our original opinion, however,

in the context of legal proceedings, if a witness has any reasonable pretension to specialized knowledge on the relevant subject, he may be offered as an expert witness, and the weight to be given his testimony is for the trier of fact to determine. Rule 702 of the Pennsylvania Rules of Evidence also provides that "a witness qualified as an expert by knowledge, skill, experience, training or education may testify." Pa.R.E. 702. Under *Flanagan,* however, a nurse duly qualified under Rule 702, but licensed under 63 P.S. § 216, is precluded from offering expert testimony on medical causation, while presumably a non-licensed nurse, *or any other individual,* with the same knowledge or experience would be permitted, under the broad common law standard for expert testimony, to offer such testimony.

601 Pa. at 248, 971 A.2d at 1210 (emphasis original). Thus, *Flanagan* clearly operates as a rule of evidence in that it precludes an otherwise qualified nurse from offering expert testimony. In this regard, *Flanagan* arguably runs afoul of Rule 702. *See Albrecht,* 554 Pa. at 45, 720 A.2d at 700. Moreover, to the extent Geisinger suggests that a nurse would be unable to obtain legally the specialized knowledge or expertise necessary to qualify as an expert witness, we note that the Professional Nursing Law does not prohibit a nurse from attending medical school, reading medical textbooks, or working along side a physician. Thus, there are any number of ways a nurse might obtain expertise that is beyond the ordinary range of training, knowledge, intelligence, or expertise, and it remains the duty of the party proffering the expert witness to establish that the witness meets these requirements.

Geisinger also maintains that *Flanagan* has not produced inconsistent case law, and that overruling *Flanagan* would "unduly liberalize" the admission of expert testimony. Appellants' Joint Supplemental Brief on Reargument at 11. As we explained in *Miller*, however, "the standard for qualification of an expert witness *is a liberal one.*" 541 Pa. at 480, 664 A.2d at 528 (emphasis added). Geisinger further suggests that the holding in our original opinion is "particularly inappropriate in light of the restrictions imposed on the qualifications of medical experts by the Legislature in MCARE." Appellants' Supplemental Brief on Reargument at 11. However, we specifically recognized in our opinion the limited impact of our decision in light of the more stringent requirements for expert testimony established by the MCARE Act, which became effective on May 19, 2002, and resulted in substantial changes in the requirements for qualifying an expert witness in medical professional liability actions. We also noted that there are situations in which the MCARE Act arguably might not apply.

Finally, Geisinger contends that *Flanagan* "does not involve a purely procedural rule," and, therefore, that if we reaffirm our prior decision overruling *Flanagan,* we should not apply our decision retroactively, because it would negatively affect its substantive rights, namely, the judgment entered in its favor. Appellants' Joint Supplemental Brief at 10, 12. In our original opinion, we explained that, in determining whether to apply a new rule of law retroactively, there are two primary considerations: (1) whether the holding involves an interpretation of a statute or some other source of law; and (2) whether the issue is substantive or procedural. *Freed,* 601 Pa. at 253, 971 A.2d at 1213. Based on these considerations, we concluded that the rule established in *Flanagan* was "*akin* to a procedural ruling," *id.* at 253, 971 A.2d at 1214 (emphasis added), and thus our holding properly was applied retroactively. Geisinger offers no argument or case law to suggest this determination was in error.

Thus, upon review, we find that Geisinger has offered no argument in its Supplemental Brief that this Court did not

already consider in reaching the decision set forth in our original opinion. Accordingly, we reaffirm our prior decision.

The proceedings on reargument are concluded and the matter is remanded per our original opinion. Jurisdiction is relinquished.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Former Justice GREENSPAN did not participate in the decision of this case.

Justice BAER joins the opinion on reargument.

Chief Justice CASTILLE joins the opinion on reargument and files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

Justice EAKIN files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join Madame Justice Todd's Opinion on Reargument. I write separately largely to address certain cogent points raised by Mr. Justice Saylor in his dissent, concerning the propriety of revisiting precedent *sua sponte,* propositions that the Majority does not address.

Preliminarily, I note that I voted to grant reargument here because I believed that the parties should have an opportunity to provide directed advocacy on the controlling question of the continued viability of *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183 (1997), a question not specifically raised by appellee or briefed by the parties in the initial discretionary appeal. *See Pridgen v. Parker Hannifin Corp.,* 591 Pa. 305, 916 A.2d 619, 621 (2007) (explaining grant of reargument where original decision encompassed matters not initially accepted for review: "it is best for the parties to an appeal to be afforded the opportunity to make a direct presentation to an appellate court concerning issues that will be addressed in the appeal proceedings"); *Coady v. Vaughn,* 564 Pa. 604, 770 A.2d 287,

294 (2001) (Castille, J., concurring) (we should "not indulge the conceit that, without adversarial presentations, it is possible to discern any and all arguments that may be made" on a given issue). Our *per curiam* order granting reargument directed that "[t]he parties shall file supplemental briefs ... addressing the issue of the continued viability of [*Flanagan* ] as well as the question of any waiver of this issue." *Freed v. Geisinger Med. Center,* 602 Pa. 207, 979 A.2d 846 (2009).

I joined the initial Majority Opinion without reservation. In approaching the distinct jurisprudential question of *sua sponte* consideration of precedent posed on reargument,[1] and with briefing and argument directed to the relevant question, I remain of the view that the vitality of the *Flanagan* case—the precedent at the heart of this controversy—was fairly implicated, for the reasons that Madame Justice Todd has identified in her Opinion on Reargument. See Majority opinion, at 229–30, 5 A.3d at 215–16.[2] I also concur in the Majority's view that, on the merits, appellants have not provided persuasive reasons to alter our initial decision.

On the question of *sua sponte* reconsideration of precedent, I recognize that reasonable minds might disagree on the point, and Justice Saylor has well articulated the countervailing considerations. Indeed, I have expressed similar concerns myself. *See Castellani v. Scranton Times, L.P.,* 598 Pa. 283, 956 A.2d 937, 954 (2008) ("No party has asked us to overrule our precedent, and we have no briefing on the considerations affecting *stare decisis.*"). Furthermore, the distinctions Justice Saylor identifies between this case and the cases cited by

1. In our original *Freed* decision, the dissenting Justices objected to the determination to overrule *Flanagan* on its merits, but not on the basis that we improperly did so *sua sponte.* 601 Pa. 233, 971 A.2d 1202, 1214–15 (2009) (Eakin, J., joined by Saylor, J., dissenting).

2. I emphasize that my view of the power and propriety of a Pennsylvania appellate court revisiting precedent on its own accord is a view peculiar to this institution, the highest court in the Commonwealth, which sets judicial policy, and holds the power of superintendency over the lower courts. The concern with the "broader picture" articulated by Justice Todd is particularly acute in cases arising on discretionary review, where we generally accept a case only because of the importance of the issue presented, and the potential statewide effect of our decision.

the Majority to support *sua sponte* adjustment of precedent are legitimate distinctions. At the same time, I believe that all Justices recognize that the question of what issues are properly reachable in an appeal is a prudential matter, not an absolute, and it is not surprising that the members of the Court, reasonably and in good faith, may reach different conclusions when presented with a particular factual and legal matrix. I would hope that one salutary benefit of the full articulation of competing views in this case will be to make the Court more attuned to the governing considerations, and to the necessity of a coherent jurisprudence on the question of whether and when to raise issues and revisit precedent on our own.

I also recognize that the question of reconsideration of precedent may not be as close for me as for some other members of the Court because I have suggested a broader approach to our power to police our precedent in the past.[3] *See, e.g., Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 475 (2006) (Castille, J., dissenting) (collecting cases) ("There are a myriad of other circumstances where individual Justices have taken it upon themselves to suggest a need for a closer look at precedent, and particularly in capital case jurisprudence. The indisputable point, as I see it, is that there is no absolute jurisprudential bar against what I propose; indeed, there is ample precedent in favor of it. Moreover, as I have noted in another context, since the affected party is unlikely to be so bold as to squarely ask for reconsideration of apparently-controlling precedent, it oftentimes falls upon this Court, or individual Justices, to notice the issue."); *Commonwealth v. Rogers,* 578 Pa. 127, 849 A.2d 1185, 1193 n. 2 (2004) (Castille, J., concurring, joined by Eakin and Baer, JJ.) ("The Majority suggests that we wait for a case where a party challenges the *Johnston/Martin* construct [governing canine searches] before we reconsider it. I have no objection. I write to outline the

3. The question of revisiting fairly implicated precedent *sua sponte* is, of course, distinct from the question of whether the parties should be offered an opportunity to be heard on the question; the grant of reargument reflects the Court's appreciation of the distinction in this case.

problem because, faced with the precedent and the effect of *stare decisis,* the Commonwealth is unlikely to forward such a challenge before the Court, or some of its members, acknowledge the difficulty. Indeed, in the recent past, this pragmatic consideration has led this Court to correct problematic precedents even in the absence of a request from the parties."). Indeed, this is the reason I was convinced to join Justice Saylor's scholarly and persuasive call for reexamination of this Court's foundational strict liability case precedent in his dissenting opinion in *Bugosh v. I.U. North America, Inc.,* 601 Pa. 277, 971 A.2d 1228, 1229–49 (2009) (*per curiam*) (Saylor, J., dissenting). Justice Saylor is correct to note the incongruity and tension between the unexplained majority determination in *Bugosh* and the *sua sponte* action here. *See* Saylor, J., Dissenting opinion, at 245 n. 11, 5 A.3d at 224–25 n. 11. For my part, I remain of the view that the dissent in *Bugosh* outlined the better course.

I also agree with Justice Saylor that the *Flanagan* question here is of less import than the foundational question presented in *Bugosh.* Although there may be cases that cry out for correction more blatantly than *Flanagan* (a decision I joined), I concur in our decision to overrule *Flanagan* because I am convinced that it was wrongly decided and has worked sufficient mischief to warrant correction by the only tribunal that can recalibrate the law in this area.

Here, we affirm the Superior Court's holding that nurse opinion testimony regarding the cause of appellee Freed's pressure wounds should have been admitted by the trial court. The Superior Court panel, faced with *Flanagan's* prohibition against such nurse opinion testimony, articulated a distinction between the medical conditions at issue in each case. In *Flanagan,* the panel opined, a medical diagnosis was required (the underlying cause of complications from a collapsed lung), but in this case, "no medical diagnosis was at issue." *Freed v. Geisinger Med. Center,* 910 A.2d 68, 74 n. 5 (Pa.Super.2006). The panel further concluded that, because the parties agreed on the medical diagnosis—wounds caused by unrelieved pressure on a part of the body of an immobilized patient—the nurse witness had only to testify that "breaches in the stan-

dard of nursing care were the cause of the development and/or worsening" of the wounds. *Id.* at 75. However, as this Court noted in our initial opinion, and contrary to the Superior Court panel's holding, the "medical" cause of the pressure wounds was not undisputed by the parties; medical causation was at issue here just as it was in *Flanagan. Freed v. Geisinger Med. Center,* 601 Pa. 233, 971 A.2d 1202, 1207 n. 5 (2009). More importantly, and despite the panel's nomenclature, it is apparent that the nurse's testimony here was proffered to show what caused appellee's wounds, and to provide the causal link between that injury and the nursing care provided by Geisinger. Under our common law standards for expert witness qualification, a nurse with appropriate experience could be qualified to provide "expert opinion testimony in a court of law regarding medical causation" in such circumstances. *Id.* at 1208. But that common law principle is in tension with *Flanagan.*

Resolution of the tension in this case necessarily called for a close reading of *Flanagan* and, in my judgment, *Flanagan's* complete bar against such nurse opinion testimony, premised upon the Professional Nursing Law, was unnecessary to the decision and erroneous. In *Flanagan,* expert testimony was required to show the underlying cause of the plaintiff's medical condition, "progressively worsening subcutaneous emphysema," arising from allegedly inadequate nursing care for a patient with a collapsed lung. Flanagan planned to present the testimony of a nurse as his only expert, on both the standard of nursing care and the "ultimate effect of that care." The trial court ruled that the nurse was precluded by the Professional Nursing Law from rendering the causation testimony, and this Court ultimately agreed. 690 A.2d at 184–86.

The difficulty with *Flanagan* was in its reliance on the Professional Nursing Law, a statute which defines "the practice of nursing," but does not purport to govern the admissibility of evidence in civil negligence cases. Instead, common law principles (and now also the MCARE Act, 40 P.S. §§ 1303.101–1303.910) govern admissibility of opinion testimony. *See Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664

A.2d 525, 528 (1995) (to be qualified to testify in given field, proffered expert witness need only possess more expertise than is within ordinary range of training, knowledge, intelligence or experience; test is whether witness has reasonable pretension to specialized knowledge on subject matter in question). The trial court has discretion to permit a witness to testify as an expert. *Id.* The question of whether Flanagan's nurse witness was qualified to testify as an expert on causation should have been determined under this well-established standard; but, instead, the Court determined there that "the normal test of competency is constrained by a statutory provision limiting the deemed competency of nurses." 690 A.2d at 185. In my view, the case *sub judice* has made clear that engrafting the definitions included in the Professional Nursing Law—a statute first enacted in 1951—onto our rules of evidence concerning expert testimony was ill-advised. Thus, notwithstanding that I joined *Flanagan,* I am convinced that we properly overrule that decision in this case.

Justice SAYLOR, dissenting.

Previously, I joined Mr. Justice Eakin's dissenting opinion opposing the overruling of *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183 (1997). *See Freed v. Geisinger Med. Ctr.,* 601 Pa. 233, 254–56, 971 A.2d 1202, 1214–15 (2009) (Eakin, J., dissenting). Upon reargument, I maintain the views ably expressed in that dissent, and I join Justice Eakin's dissenting opinion on reargument as well. Furthermore, I have material differences with the majority's perspective concerning the advisability of *sua sponte* revisiting precedent, both in general and, more particularly, as applied in the present case.

## I. The Grant of Reargument

Preliminarily, I agree with the majority's observation that the interests of all parties are best served by reargument, thus permitting the litigants to be heard on the questions the majority has made dispositive, including the advisability of overruling precedent *sua sponte. See* Majority Opinion at 227, 5 A.3d at 214. I would go further, however, to say that

this approach also best advances the broader interests of justice; mitigates potential due process concerns; and better conforms to the adversarial system of judicial review.

## II. The *Sua Sponte* Overruling of *Flanagan*

Initially, the majority characterizes the occasions upon which this Court has revisited precedent on its own initiative as "numerous." Majority Opinion at 227–30, 5 A.3d at 214–15. In fact, particularly in comparison with the regularity with which this Court recites, enforces—and, indeed, stresses— ordinary principles of issue preservation and presentation,[1] such independent reordering of rules of decision is rare, and for good reasons. The need to grant reargument in the present case to permit Petitioners actually to be heard on a legal basis invoked on the majority's own initiative to justify overturning a favorable judgment—despite never having been raised by Petitioners' opponent—illustrates the difficulties occasioned by this irregular practice.

In addition to their infrequency, *sua sponte* adjustments to rules of decision tend to occur in cases where the Court has had difficulty, over time, in administering particular, fundamental rules governing judicial review. Indeed, four of the five Pennsylvania opinions referenced by the majority arise out of, or directly concern, capital litigation.[2] The death cases

1. *See, e.g., Steiner v. Markel*, 600 Pa. 515, 522, 968 A.2d 1253, 1257 (2009) (admonishing the Superior Court not to consider waived matters *sua sponte* ); *Danville Area Sch. Dist. v. Danville Area Educ. Ass'n*, 562 Pa. 238, 247, 754 A.2d 1255, 1259 (2000) (explaining that "[s]ua sponte consideration of issues disturbs the process of orderly judicial decision making").

2. The capital cases cited by the majority in the relevant passage are *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (2005), *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), and *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998). *See* Majority Opinion at 227–30, 5 A.3d at 214–15. Although *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), was not a death case, it arose in the midst of difficulties encountered by the Court in its administration of capital appeals and has had a direct and substantial effect on the way death penalty litigation is administered in Pennsylvania.

   Even in this unique line of criminal cases, the Court recently has couched matters of issue preservation and presentation as being of "paramount importance." *Commonwealth v. Mitchell*, 588 Pa. 19, 72

comprise a unique area of the law, where this Court bears the responsibility to conduct direct appellate review over all verdicts and final post-conviction orders, and in which the Court has had great difficulty in maintaining a consensus covering core matters of review.[3]

Regarding the approach of the United States Supreme Court, as referenced by the majority, that Court has expressed reservations similar to those set forth here. *See, e.g., Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n,* 518 U.S. 604, 626, 116 S.Ct. 2309, 2321, 135 L.Ed.2d 795 (1996) (explaining that "the 'principles that animate our policy of *stare decisis* caution against overruling a longstanding precedent on a theory not argued by the parties'" (quoting *United States v. Int'l Bus. Machs. Corp.,* 517 U.S. 843, 855, 856, 116 S.Ct. 1793, 1800, 1801, 135 L.Ed.2d 124 (1996))). As in Pennsylvania, the decisions in which the High Court has taken the extraordinary step of reordering rules of decision on its own motion tend to be ones of widespread application that have generated ongoing controversy. Indeed, the majority's categorization of its *Freed* decision with such watershed decisions of civil and criminal procedure as *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188

n. 20, 902 A.2d 430, 462 n. 20 (2006); *see also id.* ("Certainly, before we could consider abandoning prior precedent and the rules of statutory construction expressed above, we should, at bottom, do so in a case where the issue is squarely raised, briefed and argued."). Indeed, ironically, the bulk of the adjustments accomplished *sua sponte* in the capital arena have occurred in the wake of the Court's decision to enforce principles of issue preservation and presentation more strictly. *See, e.g., Albrecht,* 554 Pa. at 44–45, 720 A.2d at 700.

3. The other Pennsylvania decision referenced by the majority is *Cimaszewski v. PBPP,* 582 Pa. 27, 868 A.2d 416 (2005). There, while the prior precedent of *Finnegan v. PBPP,* 576 Pa. 59, 838 A.2d 684 (2003), was not discussed in the briefs (since the briefing in *Cimaszewski* predated *Finnegan* ), the Appellant actually raised the core substantive argument (an *ex post facto* analysis) that was credited by the *Cimaszewski* majority. *See* Brief for Appellant, *Cimaszewski v. PBPP,* 2002 WL 34430156, at *15–23 (Oct. 1, 2002). Thus, the present circumstances are materially distinguishable, since Respondent did not challenge *Flanagan's* holding that nurse testimony was inadmissible as to the issue of the medical standard of care pertaining to a physician. Indeed, Respondent expressly accepted the correctness of that holding.

(1938) (holding that state substantive rules of decision apply in federal diversity cases), and *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (extending the application of the federal exclusionary rule to the States), seems particularly inapt. *See* Majority Opinion at 229–31, 5 A.3d at 215–16.

I do agree there are situations in which appellate courts legitimately may raise and decide matters of their own accord. My point is that, particularly where the Court is not merely applying a settled rule of decision to sustain a valid order or judgment,[4] the practice is peculiarly one that calls for the exercise of prudence and restraint, since it tests the limits of the adversarial process grounding the judicial system. *Accord* Adam A. Minali and Michael R. Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L.REV. 245, 272–86 (2002) (discussing the impact of *sua sponte* decision-making upon the adversarial system). With respect, it is my considered position that the *sua sponte* overruling of *Flanagan* did not reflect such deliberativeness.

First, consistent with Justice Eakin's views, I do not regard the straightforward principle announced in *Flanagan*—that

4. Under the right-for-any-reason doctrine, an order or judgment may be affirmed for any reason appearing as of record. *See Pa. Dep't of Banking v. NCAS of Del., LLC*, 596 Pa. 638, 948 A.2d 752, 761–62 (2008). *See generally* Thomas G. Saylor, *Right for Any Reason: An Unsettled Doctrine at the Supreme Court Level and An Anecdotal Experience with Former Chief Justice Cappy*, 47 DUQ. L.REV. 489, 490 n. 2 (2009) (collecting cases). Here, however, the overruling of *Flanagan* did not appear as of record—it was accomplished by the *Freed* majority *post hoc*.

Moreover, the initial judgment was in Petitioners' favor, raising questions as to the appropriate application of the right-for-any-reason principle in the first instance. *See id.* at 492–97. Indeed, where, as here, the appellee before this Court was the appellant in the intermediate appellate court, we have indicated that matters not raised and preserved in the intermediate appellate court are unavailable for appellate review. *See, e.g., In re J.M.*, 556 Pa. 63, 83 n. 15, 726 A.2d 1041, 1051 n. 15 (1999); *accord Commonwealth v. McMullen*, 599 Pa. 435, 443 n. 2, 961 A.2d 842, 846 n. 2 (2008) (holding that a litigant did not waive a claim "because it was the appellee *in [the intermediate appellate] court.*" (emphasis added)).

Although Respondent also suggests a futility rationale to excuse his failure to challenge *Flanagan* in the common pleas and intermediate appellate courts, his failure to challenge *Flanagan* before *this Court* displaces any need to address such theory.

nurse testimony as to medical diagnoses is constrained according to the legislatively-established limits of the nursing profession-as implicating the exception to *stare decisis* pertaining to decisions which are plainly erroneous. *See Freed,* 601 Pa. at 255, 971 A.2d at 1215 (Eakin, J., dissenting). Furthermore, I agree with Petitioners that *Flanagan* simply did not engender the sort of pervasive difficulties present in such cases. *See* Joint Supplemental Brief of Appellants on Reargument at 10.[5] Rather, the *Freed* majority identified only a single area of reasonable dispute concerning the breadth of *Flanagan*—whether the decision impacted on expert testimony concerning causation—which it readily corrected in *Freed. See Freed,* 601 Pa. at 242–44, 971 A.2d at 1207–08.[6] It is also worth noting that even such decisions as *Erie* and *Mapp* have generated strong and enduring responses raising legitimacy concerns in light of their *sua sponte* undertakings.[7]

5. Petitioners note:
   The Majority ... cites as its only examples [of difficulties] the Superior Court's decision in this case and *Commonwealth v. Jennings,* 958 A.2d 536 (Pa.Super.2008). In *Jennings,* the Superior Court relied on its own decision in *Freed* and, therefore, it is only the Superior Court's decision in *Freed* that is at issue. It is bootstrapping to cite the very lower court decision on appeal to evidence inconsistent application of the *Flanagan* rule.
   *Id.*

6. Furthermore, the Superior Court's position that expert standard-of-care and causation testimony may be treated differently seemed at least colorable. *See, e.g., Rodriguez v. Jackson,* 118 Ariz. 13, 574 P.2d 481, 485 (1977) ("[A] distinction must be made between testimony as to cause and testimony relative to the standard of care required of the physician."). Thus, this was simply a matter of first impression to be resolved by the Court, rather than a symptom of an intractable difficulty presented by some irreconcilable flaw in *Flanagan.*

7. *See, e.g., Erie,* 304 U.S. at 87, 58 S.Ct. at 826 (Butler, J., dissenting) ("In view of grave consequences liable to result from erroneous exertion of its power ... the Court should move cautiously, seek assistance of counsel, act only after ample deliberation, [and] show that the question is before the Court[.]"). *Mapp,* 367 U.S. at 677, 81 S.Ct. at 1704 (Harlan, J., dissenting) ("I am bound to say that what has been done is not likely to promote respect either for the Court's adjudicatory process or for the stability of its decisions."); *cf. Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 553, 119 S.Ct. 2118, 2133, 144 L.Ed.2d 494 (1999) (Stevens, J., concurring and dissenting) ("The absence of briefing or meaningful argument by the parties makes this Court's gratuitous

In addition to the inherent sensibility in reconciling expert qualifications with express statutory limits on professional competency, *Flanagan* was consistent with a significant trend, on the parts of courts and legislatures in many jurisdictions, of raising the standards governing expert witness testimony in medical malpractice actions.[8] Indeed, as all Justices participating in *Freed* recognized, in the Medical Care Availability and Reduction of Error (MCARE) Act,[9] the Pennsylvania General Assembly has specifically implemented a scheme which not only is consistent with *Flanagan* but expands upon it. *See Freed*, 601 Pa. at 256, 971 A.2d at 1215 (Eakin, J., dissenting) (referring to 40 P.S. § 1303.512).[10] This Court has

decision to volunteer an opinion on this nonissue particularly ill advised."); *State v. Zabawa*, 279 Mont. 307, 928 P.2d 151, 158 (1996) (Nelson, J., concurring) ("While the temptation is often great to decide a case on the basis of the argument that 'should have been made,' but was not, in blind-siding an issue we run the very real risk of substituting advocacy for neutrality."). *See generally* Barry A. Miller, *Sua Sponte Appellate Rulings: When Courts Deprive Litigants of an Opportunity to be Heard*, 39 SAN DIEGO L. REV. 1253, 1260 (2002) ("The absence of a consistent principle leaves courts open to the accusation that ignoring the adversary process is a political action, where a court reaches out to legislate instead of following judicial norms.").

8. *See, e.g., Stryczek v. Methodist Hosps., Inc.*, 694 N.E.2d 1186, 1189 (Ind.Ct.App.1998) (reflecting the common-law rule in Indiana that "[i]n an action for [medical] malpractice, whether the defendant used suitable professional skill must generally be proven by expert testimony, that is, other physicians, surgeons, or orthodontists, as the case may be") (citation and quotation marks omitted); *Morris v. Children's Hosp. Med. Ctr.*, 73 Ohio App.3d 437, 597 N.E.2d 1110, 1115 (1991) (grounding the purposes of an evidentiary rule requiring liability experts in medical malpractice actions to be licensed to practice medicine in terms of discouraging the use of professional witnesses); *Rodriguez*, 574 P.2d at 485 (collecting decisions reflecting a similar approach); James Walker Smith, HOSPITAL LIABILITY § 11.02 (2009) (explaining that courts generally admit the testimony of nurse-experts "so long as they do not invade the province of expertise attributed to physicians and are limited to the expression of opinions of nursing care"); 1 McCORMICK ON EVID. § 13 n. 17.2 (6th ed.2009) (collecting statutory provisions addressing special qualifications for expert testimony in medical malpractice cases).

9. Act of March 20, 2002, P.L. 154, No. 13 (40 P.S. §§ 1303.101–1303.1115).

10. Moreover, the relevant provisions of the MCARE Act specifically resolved the inconsistency arising from limiting the enhanced qualification requirements to nurses. *See* 40 P.S. § 1303.512(b) ("An expert

previously refused to overrule common law decisions to accomplish "a closed-ended departure from current practice," where the Legislature has codified the pre-existing common law. *See Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp.*, 579 Pa. 275, 292–93, 855 A.2d 818, 829–30 (2004). I continue to question the wisdom of undertaking such a closed-ended departure in any event, let alone outside the normal parameters of judicial review.[11]

Finally, to the extent the *Freed* majority raised a concern with a conflict between rules specific to medical malpractice actions and the broader class of tort cases, *see Freed*, 601 Pa. at 244–47, 971 A.2d at 1208–10, such concern seems unfounded, in that the salutary purposes of the special rules are very clear. *See infra* § III (discussing the implementation of special rules in the medical malpractice arena to address social policy issues). Indeed, this Court itself has implemented an extensive set of rules unique to professional liability claims encompassing medical malpractice. *See* Pa.R.Civ.P. Nos. 1042.1–1042.72.

## III. Subtexts of *Freed*

I also believe there are two strong subtexts of *Freed* (which ostensibly concerned statutory construction) bearing mention.[12] The first is who—as between the Legislature and this Court—may regulate the admission of expert evidence in the

testifying on a medical matter [must] [p]ossess an unrestricted physician's license[.]"). Thus, the Legislature itself already had undertaken to cure an "incongruity" relied on by the *Freed* majority in retroactively overruling *Flanagan. See Freed*, 601 Pa. at 248, 971 A.2d at 1210.

11. Parenthetically, to all appearances, the Court seems laboriously to be awaiting "the right case" in which to address the pervasive difficulties encountered in Pennsylvania state and federal courts in the aftermath of the unique interpretation of Section 402A of the Second Restatement of Torts adopted in *Azzarello v. Black Brothers Company, Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978). *See generally Bugosh v. I.U. N. Am., Inc.*, 601 Pa. 277, 279, 971 A.2d 1228, 1229 (2009) (Saylor, J., dissenting, joined by Castille, C.J.). It is unclear why less patience was warranted in the present matter of far narrower applicability.

12. While some of my thoughts along these lines may be of a *sua sponte* character, the appeal already has been untethered from the regular moorings, and, thus, I believe my further comments are warranted.

courtroom. This question is implicated, in particular, since the majority has repeatedly couched the relevant evidentiary principles as "procedural" in nature, *see* Majority Opinion at 233, 5 A.3d at 217; *Freed*, 601 Pa. at 250–51, 253, 971 A.2d at 1212, 1214, and this Court has maintained that Article V, Section 10(c) of the Pennsylvania Constitution reposits exclusive control of procedural matters in this Court. *See, e.g., Commonwealth v. McMullen*, 599 Pa. 435, 444, 961 A.2d 842, 847 (2008).

The second subtext is that *Freed* was issued in the wake of what has been termed a medical malpractice crisis. The disconcerting circumstances include: prohibitive malpractice insurance costs; hospital and practice closings; physician departures from the Commonwealth (albeit with the numbers and causes being in dispute); the phenomenon of some physicians altering their practices to avoid complex, high-risk interventions; and multiple remedial attempts by the Legislature to advance stabilization, including the creation and maintenance of government-run administrative schemes of supplemental insurance and regulation. *See, e.g.,* 40 P.S. §§ 1303.101–1303.1115. In my view, consistent with that of the General Assembly, the matter of medical malpractice reform presents a social policy issue with direct impact on citizen access to health services and quality of care matters. *See generally* 40 P.S. § 1303.502 ("Ensuring the future availability of and access to quality health care is a fundamental responsibility that the General Assembly must fulfill as a promise to our children, our parents and our grandparents.").[13]

**13.** The scale and cause of these problems has been the subject of debate. One commentator summarized such dialogue as follows:

Insurers and doctors blame "predatory" trial attorneys, "frivolous" lawsuits, and "out of control" juries for the spike in insurance premiums. In turn, consumer groups accuse insurance companies of "price gouging," while plaintiffs' attorneys point to an exorbitant rate of medical errors and the need to deter malpractice and provide compensation to injured patients.

Mimi Marchev, NAT'L ACAD. FOR STATE HEALTH POLICY, *The Medical Malpractice Insurance Crisis: Opportunity for State Action* 6 (July 2002), *quoted in* Christina O. Jackiw, *The Current Medical Liability Insurance Crisis: An Overview of the Problem, Its Catalysts and Solutions,* 13 ANNALS HEALTH L. 505, 509 (2004).

Nevertheless, after *Freed*, it would seem that there is a very strong case to be made that the 2002 MCARE Act's requirements for the admission of expert testimony in medical malpractice cases violate Article 10(c) and should be suspended. Indeed—since this Court has promulgated an entire body of evidentiary rules via its procedural rulemaking powers, *see* Pa.R.E. 101(b)—under a strong approach to the exclusivity (and in light of *Freed's* pronouncement), there would seem to be little doubt that MCARE requirements (as well as all other legislative inroads into evidentiary matters) are unconstitutional. Notably, such a strong approach appears to have prevailed in 1997, when this Court suspended numerous provisions of prior medical malpractice reform legislation as intruding on the Court's exclusive powers under Section 10(c). *See, e.g.*, 40 P.S. § 1301.813–A (Dilatory or frivolous motions, claims and defenses) (suspended).[14]

However, the Court's efforts to define the limits of exclusivity of its procedural rulemaking powers solely in terms of the nebulous line between substance and procedure have yielded a number of facially implausible holdings. *See, e.g., Laudenberger v. Port Auth. of Allegheny County*, 496 Pa. 52, 66–67, 436 A.2d 147, 155 (1981) (treating the promulgation of a rule awarding monetary damages for delay in civil cases as procedural rulemaking); *Commonwealth v. Morris*, 565 Pa. 1, 30, 771 A.2d 721, 738 (2001) (holding that a stay of a capital prisoner's execution is "substantive").[15] In the face of such decisions, one jurist has commented that "[t]he demarcation between laws bearing on substantive rights and those that are 'purely procedural' is notoriously vexing and has fostered

14. Parenthetically, Court's action in 1997 was also undertaken *sua sponte*, and outside the context of any pending case, thus lending itself to controversy similar to that which attends *Freed*.

15. *See generally Commonwealth v. Morris*, 573 Pa. 157, 187, 822 A.2d 684, 702 (2003) (Saylor, J., concurring) ("It would seem, at least to me, to be more rational to deem the maintenance of the status quo to be procedural and an affirmative award of relief substantive; indeed, given the *Morris* and *Laudenberger* holdings in these regards, it is quite difficult for me to predict how the substantive/procedural dichotomy will be applied to various decisions made by the legislative and judicial branches in future contexts as they may arise." (citations omitted)).

disagreement amongst generations of jurists." *Wexler v. Hecht*, 847 A.2d 95, 111 (Pa.Super.2004) (Johnson, J., dissenting). Moreover, this Court regularly abides various inroads by the Legislature into procedural matters, with the regular enforcement of procedural provisions of the Post Conviction Relief Act presenting a ready example. *See, e.g.*, 42 Pa.C.S. § 9545. Thus, there would appear to be some indistinct line between procedural matters treated by the Court as being within its exclusive province and procedural matters as to which the Court will share the authority.

There are several difficulties with a broad and intransigent notion of exclusivity. First, many matters of procedure touch heavily on substance, so that the most effective way to achieve some sort of substantive impact is to adjust the procedure. This Court's directed interventions in the professional liability arena—including venue restrictions, *see* Pa.R.Civ.P. No. 1006(a.1), and certificate-of-merit requirements, *see* Pa. R.Civ.P. No. 1042.3—provide ready examples. Thus, under the strong approach, although the Court exclusively controls important means to effect substantive improvements, it lacks tools necessary to make fully informed and proactive social policy decisions. *See Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 302, 989 A.2d 313, 333 (2010) (referencing the broader tools available to the legislative branch in making social policy judgments, such as policy hearings and comprehensive investigations).[16]

This state of affairs often places the Court in a reactive role when it comes to broader social policy matters impacted by judicial procedures. For example, the Court encountered significant pressure to adjust civil practice after it substantial-

16. *See generally Naylor v. Twp. of Hellam*, 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the General Assembly's superior ability to examine social policy issues and determine legal standards so as to balance competing concerns); *Program Admin. Servs., Inc. v. Dauphin County Gen. Auth.*, 593 Pa. 184, 192, 928 A.2d 1013, 1017–18 (2007) ("[I]t is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations.").

ly invalidated the legislative medical malpractice reform efforts in 1997. *See, e.g.,* House Resolution No. 385 (adopted Dec. 12, 2001) (captioned: "Urging the Supreme Court of Pennsylvania to reinstate certain provisions of Act 135 of 1996 amending the Health Care Services Malpractice Act to provide for medical malpractice tort reform."). It should not be talking out of turn to relate that the thwarted legislative medical malpractice reform efforts, as well as the representative branch's continued entreaties, were factors in the Court's ultimate promulgation, in 2003, of a certificate of merit requirement, *see* Pa.R.Civ.P. No. 1042.3, parallel that which the Legislature had attempted to implement in 1996. *See* 40 P.S. § 1301.821–A (suspended). The medical malpractice venue restriction embodied in Rule of Civil Procedure 1006(a.1) followed an analogous path, albeit within a more compressed timeframe: a substantively identical provision was first enacted by the Legislature in 2002, which this Court incorporated into the civil procedural rules in 2003. *See* Pa.R.Civ.P. No. 1006, Explanatory Comment—Jan. 27, 2003.

As starkly demonstrated by these circumstances, there is a substantial lag factor, in procedural adjustments having social policy ramifications, consequent to the Court's limited role and resources.[17] In such circumstances, it is very difficult to discern how the Legislature can effectively address social policy issues if all remedial measures touching on court procedures are to be vetted through the Court, perhaps for the better part of a decade.

The medical malpractice arena is a unique area of litigation in which it is necessary to balance the interests of physicians

17. The *Freed* decision provides another compelling example. Across the country, the social issues impacted by medical malpractice litigation have caused legislatures and courts to consider enhanced qualification requirements for expert witnesses as one remedial measure. *See generally* Theodore R. LeBlang, *The Medical Malpractice Crisis—Is There A Solution?*, 27 J. LEGAL MED. 1, 1–2, 7, 10 (2006) ("Clearly, a debate has raged in state legislatures throughout the country and in the halls of Congress" and including "higher standards of qualification for expert witness" among the various reform proposals). Nevertheless, the *Freed* majority reached outside the parameters of ordinary judicial review to reinstate the liberal common-law rule with no comment on this broader context.

and injured patients. On the one hand, physicians, by virtue of their occupation, are required to lay hands on patients, and medical decision-making may be complex and some procedures carry high risks. In their efforts to help others, physicians' personal assets are potentially at risk. Some patients who face an inevitable decline in their health, or who suffer setbacks after making informed choices, may nevertheless look for a source of blame. The phenomena of frivolous lawsuits and professional witnesses increase the cost and potential exposure for physicians and insurers. *See, e.g., Cooper v. Schoffstall,* 588 Pa. 505, 522–25, 905 A.2d 482, 493–95 (2006). Although medical malpractice litigation may be steeped in science, physicians are exposed to a "more-likely-than-not" determination by five-sixth of twelve lay jurors who need not necessarily even agree on the ultimate question of liability. *See Fritz v. Wright,* 589 Pa. 219, 223, 907 A.2d 1083, 1085 (2006) (adopting the "any majority" rule governing jury verdicts).

On the other hand, injured patients also have substantial, constitutionally protected, interests. Medical negligence does occur, and where the requirements of tort law are met, injured patients are entitled to just compensation. *See* Pa. Const. art. I § 11 (embodying the right a remedy). Injured patients may face difficulties in obtaining expert witnesses, particularly in specialty areas, on account of a reluctance on the part of other practitioners to judge a peer negatively. In cases in which evidence of negligence is not readily available or where the amount of potential recovery is not substantial, injured patients may have difficulty obtaining representation and advancing a lawsuit. Litigation phenomena such as that of the professional witness work in both directions. *See Cooper,* 588 Pa. at 522–25, 905 A.2d at 493–95. More generally, plaintiffs face many of the same unavoidable uncertainties inherent in the justice system as do defendants.

In light of such important, conflicting interests, and the impact of malpractice litigation on access to and quality of medical care, it is very clear that the necessary regulation of

the medical malpractice litigation arena requires difficult social policy judgments appropriate to the legislative branch.

In *Laudenberger*, this Court determined that it was authorized to adjust substantive matters via its rulemaking powers to further procedural ends. *See Laudenberger*, 496 Pa. at 66–67, 436 A.2d at 155. I continue to believe this principle should work in both directions. "[A]s I have previously expressed, both in gray areas between substance and procedure, and in matters that have not yet been occupied by this Court via its own procedural rules, I would allow some latitude to the Legislature to make rules touching on procedure, so long as such rules are reasonable and do not unduly impinge on this Court's constitutionally prescribed powers and prerogatives." *McMullen*, 599 Pa. at 458, 961 A.2d at 856 (Saylor, J., concurring and dissenting).[18]

With Article V, Section 10(c), the framers of the Pennsylvania Constitution gave the Court the authority to defend itself from unwarranted encroachments. I do not believe, however, that the framers intended to preclude the Court from intelligently distinguishing between such intrusions and legitimate efforts on the part of the Legislature to accomplish its own responsibilities in advancing beneficial social policy in the Commonwealth. Indeed, the Constitution specifically sets out the suspension requirement in much narrower terms than the rulemaking power. *See* PA. CONST. art. V, § 10(c) ("All laws shall be suspended *to the extent they are inconsistent with rules prescribed under these provisions.*" (emphasis added)).

18. *Cf. Morris,* 573 Pa. at 187, 822 A.2d at 702 (Saylor, J., concurring) (explaining that "[w]here the Legislature has proceeded [at the boundary between legislative and judicial power], I have taken the position that a degree of comity is appropriate and deference due to such aspects of its design as may be deemed reasonable, although these may nonetheless have a procedural dynamic."); *Shaulis v. Pa. State Ethics Comm'n,* 574 Pa. 680, 702–04, 833 A.2d 123, 136–37 (2003) (Saylor, J., dissenting) (expressing similar thoughts in the context of the Court's power to regulate the practice of law); *Gmerek v. State Ethics Comm'n,* 569 Pa. 579, 595–604, 807 A.2d 812, 822–27 (2002) (Saylor, J., opinion supporting reversal) (same); *Allen v. Mellinger,* 567 Pa. 1, 14, 784 A.2d 762, 769 (2001) (Saylor, J., concurring, joined by Castille, J.) (advocating a reexamination of the means for determining the limits of the Court's exclusive procedural rulemaking authority).

As demonstrated in numerous historical anecdotes, the Court has the ability to respect statutes where there are no contrary rules, or to promulgate rules consistent with the will of the policy-making branch.

Given its superior tools and resources, the Legislature may very well have a better view of the "broader picture" to which the majority lays claim. Majority Opinion at 229, 5 A.3d at 215. The alternative is for this Court to continue to assume a central role in substantive social policy reform efforts, carrying the unfortunate byproduct of direct involvement in inherently political processes and decisions.

## IV. Conclusion

In summary, I do not believe *Flanagan* was wrongly decided. Even if it was, the reasoning and effect were not so poor as to implicate an exception to the necessary, stabilizing principle of *stare decisis*. This is so, particularly, since the General Assembly had the ability to clarify its intentions in the aftermath of *Flanagan*. Indeed, the majority's approach is especially troubling, since the Legislature has demonstrated, in no uncertain terms, that these intentions are entirely consistent with *Flanagan* and contrary to *Freed*.

Furthermore, the majority's *sua sponte* decision-making appears to me to implicate the broader issue of this Court's power under Article V, Section 10(c). On that matter, I believe we should consider: the Legislature's primacy in public policy matters; the limitations inherent in the adjudicatory process;[19] and the character and appropriate application of this Court's resources. *See PriceWaterhouseCoopers*, 605 Pa. at 301 n. 27, 989 A.2d at 333 n. 27. Where the Legislature attempts to address important matters of social policy, I

19. *See PriceWaterhouseCoopers*, 605 Pa. at 301, 989 A.2d at 333 (explaining that, "[u]nlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion.").

While the Court can benefit from the advice of committees and public input in the rulemaking setting, notably, *Freed's* "procedural" ruling retroactively enforcing the common-law standard for expert testimony in a medical malpractice action occurred in the narrower adjudicative setting.

believe a greater measure of comity and deference is in order than sometimes has been shown in the past.

Justice EAKIN, dissenting.

I joined the recommendation to grant reargument because I believe the majority opinion reached an incorrect result. The prior majority held the Professional Nursing Law does not prohibit a nurse from giving expert opinion testimony regarding medical causation. In doing so, the majority overruled *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183 (1997), and did so retroactively. *Freed v. Geisinger Medical Center,* 601 Pa. 233, 971 A.2d 1202, 1214 (2009). Furthermore, the majority held the trial court should assess any expert witness's competency under the standard set forth in *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525, 528 (1995)[1] or under the MCARE Act, if applicable. For the reasons set forth in my prior dissenting opinion, I would reverse the Superior Court and remand for reinstatement of the trial court's grant of a compulsory non-suit in Petitioners' favor, pursuant to *Flanagan.*

*Flanagan,* which held a nurse is precluded from offering expert opinion testimony regarding a medical diagnosis, deferred to the Professional Nursing Law's limitations, and acknowledged nurses are "competent to provide expert testimony regarding applicable standards of *nursing care.*" *Flanagan,* at 185 (emphasis added). Here, a medical—not a nursing—diagnosis was at issue. The legislature has prohibited nurses from rendering a medical diagnosis in the scope of their profession; accordingly, it simply does not follow a nurse would be qualified to render expert opinion as to a medical diagnosis in a court of law. To allow one to opine in court about things one is explicitly prohibited from opining about in the real professional world is illogical at best.

1. *Miller* held a coroner with years of experience had specialized knowledge regarding time of death and qualified as an expert to testify regarding same. *Id.,* at 529. I find *Miller's* general evidentiary considerations easily distinguishable from cases invoking a statutory prohibition.

There is a statute that says one professionally licensed group cannot diagnose that which falls in another area of professional licensure; I fail to see the wisdom of allowing civil claims to be founded upon or supported by such impermissible opinions.