J-A14030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SARWAT EZZELDIN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MAGDA EZZELDIN | |
| | No. 1495 EDA 2016 |

Appeal from the Order Entered April 27, 2016
In the Court of Common Pleas of Pike County
Civil Division at No(s): No. 442-2007-CIVIL

BEFORE: BENDER, P.J.E., BOWES AND SHOGAN, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 27, 2017**

Sarwat Ezzeldin ("Husband") appeals from the April 27, 2016 order of equitable distribution entered in this divorce action. We affirm in part, reverse in part, and remand for proceedings consistent with this adjudication.

On March 21, 2007, Husband instituted this action for divorce and equitable distribution against Appellee Magda Ezzeldin ("Wife"). The matter was assigned to a master, who held hearings on July 22, 2011, November 7, 2011, July 16, 2012, March 4, 2013, June 21, 2013, September 27, 2013, December 10, 2013, December 11, 2013, and August 26, 2014. On November 5, 2015, Appellant moved to compel the master to file his report

and recommendation, that motion was granted, and the master's report was filed on December 3, 2015.

Husband and Wife were married on November 25, 1977, and two children, who are both emancipated, were born of the marriage. In February 2006, Husband became disabled. He received a settlement of $125,332 for that disability from a private insurance company as well as monthly social security disability payments. Wife suffered a stroke in 2012, and began working part-time and receiving monthly disability payments from a private insurer.

The master found that the parties had the following marital assets. First, the marital residence, which he appraised at a net value, after encumbrances, of $349,000, located in Baldwin, New York. Wife had exclusive possession of this residence after the parties' separation, paid for its upkeep, and made substantial repairs to that property. Husband and Wife also owned 1) a home in Pike County, Pennsylvania, referred to as "the Hawley residence" that was listed for sale in 2011 at $359,000 and was encumbered by a mortgage of $220,000; 2) real estate in Cannes, France, that was sold in 2011; 3) vacation property in Egypt valued at $212,818.40; 4) retirement accounts; 5) personal property that the parties already had distributed in kind; and 6) various vehicles. The master valued the marital property at $1,120,375, concluding that each party should receive fifty percent of that amount. The parties had already divided the

property such that Wife owed Husband a total of $183,872.72 to account for various expenses paid on the Cannes property by Husband prior to its sale and to equalize the value of the marital assets owned by the parties.

Both parties filed exceptions, all of which were denied. The divorce court adopted the master's report and granted the parties a divorce. This appeal followed. Husband raises these averments on appeal:

1. Whether it was an error of law and/or gross abuse of discretion for the court to have accepted the untimely report and recommendation of the master as same was filed in direct violation of Pa.R.C.P. 1920.55-2(a)(1)(ii) and the untimeliness prejudiced the Appellant.

2. Whether it was an error of law and/or gross abuse of discretion to have allowed the Appellee's expert to testify over the objection of Appellant's counsel.

3. Whether the trial court committed an error of law and/or gross abuse of discretion in finding that the Egyptian property was subject to equitable distribution and assigning it an unsubstantiated and arbitrary value of $212,818.40 when same was not supported by the testimony or evidence of record.

4. Whether the trial court committed an error of law and/or gross abuse of discretion in failing to direct that the credits due to Appellant from the Cannes France be converted to U.S. dollars at the then prevailing rate when the record demonstrated that the $39,000 credit was intended to be 39,000 Euros instead.

5. Whether the trial court committed an error of law and/or gross abuse of discretion in failing to schedule further a further hearing on the Hawley residence when the master himself recognized that he did not have sufficient evidence to make a decision that would effectuate economic justice on that issue.

6. Whether the trial court committed an error of law and/or gross abuse of discretion in accepting the recommendation of the master in assigning market and rental values with respect to

the marital New York property which were not current and not supported by the record.

7. Whether the trial court committed an error of law and/or gross abuse of discretion in accepting values which the master assigned to Appellee's retirement assets which were not supported by the record and were lacking full disclosure.

Appellant's brief at 8-9.

We first outline the pertinent standard of review herein:

A trial court has broad discretion when fashioning an award of equitable distribution. Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. This Court will not find an "abuse of discretion" unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record. In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. We measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights.

Moreover, it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence. We are also aware that a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties.

***Carney v. Carney***, 167 A.3d 127, 131 (Pa.Super. 2017) (quoting

***Morgante v. Morgante***, 119 A.3d 382, 386–87 (Pa.Super. 2015)).

Husband's first issue relates to the master's violation of Pa.R.C.P. 1920.55-2, which provides in pertinent part that, after hearings are concluded, "the master shall file the record and the report within . . . thirty days from the last to occur of the receipt of the transcript by the master or close of the record in contested actions[.]" Pa.R.C.P. 1920.55-2(a)(1)(ii). Herein, there was a fifteen-month delay between the close of the record at the final hearing and the filing of the report. While we are fully aware that this provision was violated, we conclude that Husband is not entitled to relief. First, the violation in question was readily apparent by September 26, 2014, which was the thirty-first day after the final hearing, and the close of the record herein. Husband took no action to compel the filing of the master's report until thirteen months later. He offers no explanation for his failure to seek a remedy of the situation for over one year, and levels no credible claim of prejudice by the Rule's violation, with one exception.

That exception pertains to a decline in value of a marital asset, and we will correct the prejudice inuring to Husband, *infra*, in connection with our discussion of his issue number five. Additionally, Husband offers no viable remedy for the delay in filing the report. The hearings had been held, and it would be a waste of both the parties' and judicial resources to require the entire matter to be retried after there were nine hearings on the equitable distribution matters. This panel will remedy the prejudice caused to

Husband by the delay in this appeal. Simply put, the first contention on appeal affords Husband no relief.

Husband's second issue relates to the master's acceptance of testimony from Milad Yanni regarding title to Egyptian property, which Husband claimed that he transferred to his sister to repay a debt that he owed her. The contentions concerning Mr. Yanni relate to the master's acceptance of proof presented by Wife in the form of telephonic testimony from Mr. Yanni, an Egyptian attorney, who established that title to the property in question remained in Husband's name.

On appeal, Husband raises several objections to Mr. Yanni's proof, and he contends that Mr. Yanni should not have been permitted to provide evidence because: 1) in violation of Pa.R.C.P. 1920.33(2),[1] Wife's pretrial statement did not include Mr. Yanni's name, address, qualifications, experience or report, Appellant's brief at 24; 2) Mr. Yanni was not qualified to offer opinion testimony regarding the ownership of the Egyptian property, *Id*.; 3) there was no good cause shown to permit Mr. Yanni to testify by

---

[1] That rule provides that a party must provide to the opposing spouse the name and address of any expert witness the party intends to call at trial, more specifically stating, "A report of each expert witness listed shall be attached to the pre-trial statement. The report shall describe the expert's qualifications and experience, state the substance of the facts and opinions to which the expert is expected to testify and summarize the grounds for each opinion[.]" Pa.R.C.P. No. 1920.33(2)

telephone as required by Pa.R.C.P. 1930.3,[2] *Id*. at 26; and 4) Husband's testimony that the property was informally transferred to his sister should have been accepted given Mr. Yanni's inexperience with military law. *Id*. at 26-33.

Husband did not raise his first objection before the master. Although Husband noted that he did not have Mr. Yanni's "CV, resume . . . [or] copy of his license to practice law," he neglected to assert, to any extent, that Mr. Yanni was not permitted to testify due to these defects. N.T. Hearing, 7/16/12, at 13. Husband did raise his second objection before the master by maintaining that the witness was not qualified to offer an opinion, *id*., but Wife proceeded to establish that Mr. Yanni graduated from the University of Cairo with a law degree, had a license to practice law, was a member of the Egyptian equivalent of the bar association, and had been employed as an attorney for twenty-one years. *Id*. at 13-14. Additionally, Mr. Yanni's practice was devoted almost entirely to real estate law. *Id*. at 15.

In light of the foregoing, the master found him qualified to offer an opinion as to the ownership of Husband's property in Egypt, and Mr. Yanni proceeded to testify that the contract of sale between Husband and his sister

_____

[2] "With the approval of the court upon good cause shown, a party or witness may be deposed or testify by telephone, audiovisual or other electronic means at a designated location in all domestic relations matters." Pa.R.C.P. 1930.3

that Husband had presented to Wife was ineffectual under Egyptian law to transfer ownership of the property in question. *Id*. at 19-21. Mr. Yanni thereafter personally ascertained that the property belonged to Husband by examining records from the town where the property was located and discovering that all of the utilities were in Husband's name. *Id*. at 22-23.

As our Supreme Court explained in *Freed v. Geisinger Med. Ctr.*, 5 A.3d 212, 216 (Pa. 2010), "if a witness has any reasonable pretension to specialized knowledge on the relevant subject, he may be offered as an expert witness, and the weight to be given his testimony is for the trier of fact to determine. Rule 702 of the Pennsylvania Rules of Evidence also provides that 'a witness qualified as an expert by knowledge, skill, experience, training or education may testify.' Pa.R.E. 702." Mr. Yanni unquestionably was qualified to offer an opinion as to how property was titled in Egypt.

Husband also complained to the master that there was no good cause shown so as to permit Mr. Yanni's testimony via telephone. Thereafter, there was a discussion on the record wherein Wife asserted that the parties agreed to accept the testimony by telephone, Husband professed a lack of memory of such an agreement, and the master resolved the conflict through his own recollection that the parties had agreed that testimony about the Egyptian property could be received by means of telephone. *Id*. at 5-7. Furthermore, since the witness was in Egypt and had to be an expert in

Egyptian law, there was good cause shown for taking the testimony by electronic means rather than having the witness spend thousands of dollars to travel to the United States to establish the ownership of one marital asset, when that issue was straight forward and did not require extensive discussion by the witness in question. Accordingly, we reject Husband's third objection to Mr. Yanni's testimony.

Husband's ultimate challenge to the finding that the Egyptian property was marital property subject to equitable distribution is that the master erred in failing to give credence to Husband's claim that he transferred the property to his sister. While Husband also levels vague complaints regarding missing documents and about Mr. Yanni's admitted lack of knowledge about Egyptian military law, we find those complaints insufficient to warrant alteration of the trial court's finding regarding the Egyptian property. The record established that Mr. Yanni was properly qualified as an expert in Egyptian real estate law, Husband provides no "Egyptian military law" that would militate in favor of a finding that he validly transferred the property in question to his sister, and Husband was supplied with any documentation pertinent to the issues raised before the master.

As to Husband's challenge to the master's rejection of his testimony that he did not own the property and acceptance of Mr. Yanni's proof that the real estate was still titled in Husband's name, we repeat the rule of law enunciated, *supra*, that the master's recommendations are accorded full

consideration on questions of credibility. The master chose not to believe Husband's position that he gave his sister the Egyptian property to satisfy a debt that he owed her. This credibility determination was amply supported by the contrary evidence of Mr. Yanni, who examined local real estate records and utility bills to establish that the property in question was still owned by Husband. Thus, we reject Husband's allegation on appeal that the trial court erred in accepting the master's finding that the Egyptian property was a marital asset.

Husband's third issue on appeal concerns the value placed on the Egyptian property, and he claims that it was only worth between $40,000 to $60,000. The master found that the property had a value of $212,818.40 based upon the fact that Husband himself claimed that it was worth 200,000 Euros, which the master converted to United States dollars, on two mortgage applications that he admittedly completed. The master converted the Euros to United States dollars and assigned the property the value in question. In **Childress v. Bogosian**, 12 A.3d 448, 456 (Pa.Super. 2011) (citation omitted), we observed:

> The Divorce Code does not specify a particular method of valuing assets. Thus, the trial court must exercise discretion and rely on the estimates, inventories, records of purchase prices, and appraisals submitted by both parties. When determining the value of marital property, the court is free to accept all, part or none of the evidence as to the true and correct value of the property. Where the evidence offered by one party is uncontradicted, the court may adopt this value even though the resulting valuation would have been different if more accurate

and complete evidence had been presented. A trial court does not abuse its discretion in adopting the only valuation submitted by the parties.

In the present case, Wife submitted into evidence two mortgage applications, and Husband admitted that the documents contained his writing. N.T. Hearing, 7/16/12, at 84-87. In those mortgage applications, Husband represented that the Egyptian property was worth 200,000 Euros and was unencumbered. As we have articulated that the value of a marital asset can be premised upon any type of proof and since Husband admittedly completed two mortgage applications assigned a 200,000-Euro value to the Egyptian property, we find no error in the master's acceptance of that documentary proof as the value of the Egyptian property.

Husband's fourth issue on appeal concerns the amount of credit that he received for payments to maintain the real estate in Cannes, France. His position is that the master obviously erred in crediting him for $39,000 in United States dollars when the uncontracted evidence was that he expended 39,000 Euros, which should have been converted to $58,016.34 in United States dollars. Appellant's brief at 37. We cannot agree with Husband's characterization of the record, as it was Husband who represented that he expended 54,000 Euros for upkeep while Wife contradicted that testimony by stating that Husband transferred $39,000 in United States dollars to Egypt so that it could be exchanged into Euros at a better rate and then sent to Cannes.

Specifically, Husband reported on the money that he spent on the Cannes property as follows: "Q: Did you pay monies into the French property or to maintain it from the date of separation forward? A. Yes. Q: What was the total amount that you paid into it? A. 54,000 Euros." N.T. Hearing, 7/22/11, at 123. On her part, Wife admitted that Husband paid money for upkeep on the Cannes property, stating: "Q. Okay. Did Mr. Ezzeldin expend money on [the French] property? A. Yes, he did. Q: How much did he spend? A. He spent $39,000." N.T. Hearing, 7/21/13, at 32. Wife clarified that the money in question was United States dollars, not Euros, stating, "**We sent the money from New York to Egypt** and he transferred it with a very good rate because he used to keep monitoring the exchange rate and we got the most out of the exchange sending the money through Cairo to France." *Id*. at 33-34.

Accordingly, the record establishes that there was no clear error regarding the amount of the credit. Husband claimed that the amount that he sent was 54,000 in Euros while Wife stated that he sent $39,000 in dollars from the United States through Egypt to France to obtain a good exchange rate. The master was permitted to credit Wife's testimony that the money was United States dollars rather than Euros. Hence, we reject Husband's fourth issue raised on appeal.

Husband's fifth position is that the master improperly found that property referred to as the Hawley residence had $100,000 in equity. That

$100,000 was assigned to Husband in the equitable distribution equation. Husband notes that, during the lengthy delay between the end of the hearings and the master's issuance of his report, the Hawley property admittedly was sold without any profit and that there actually was zero equity in that real estate. The case law provides that, in valuing marital assets, there is a clear preference for use of date of distribution value so that the marital estate can be properly valued and equity between the parties achieved. "In determining the value of marital assets, a court must choose a date of valuation which best works economic justice between the parties. The same date need not be used for all assets." **Smith v. Smith**, 904 A.2d 15, 18 (Pa.Super. 2006). We observed in **Smith** that our Supreme Court in **Sutliff v. Sutliff**, 543 A.2d 534 (Pa. 1988) indicated that the date of distribution should generally be utilized for determining the value of a marital asset as that date is the one that will most likely achieve economic justice. There are only limited circumstances when a different valuation date, normally the date of separation, is utilized. **Smith**, **supra**. Those circumstances include when one spouse has consumed or disposed of the asset in question or if conditions render it difficult to ascertain the date-of-distribution value. **Id**. Neither of those circumstances is present in this case.

Instead, it was undisputed that the Hawley residence was placed on the market and sold after the evidence before the master was closed. The property was sold for no gain, and, while there was proof presented to the

master that the Hawley residence had $100,000 in equity, that fact was disproven by subsequent events. Husband did not dispose of or consume the Hawley residence, and its date-of-distribution value was readily established by the actual sale of the property in question. Hence, we conclude that there was no value in the Hawley residence, and Husband should not have been assigned $100,000 with respect to that asset. The equitable distribution equation must be recalculated so that Husband is not distributed an asset with an assigned value of $100,000 when there was no value to that item.

Husband's sixth averment is that Wife should have been charged fair rental value on the Baldwin residence, which she occupied after the parties separated. As we have stated in **Lee v. Lee**, 978 A.2d 385 (Pa.Super. 2009), "[I]t is within the discretion of the trial court to grant rental value as a part of equitable distribution." The rationale for an award of rental value is that one party does not have the benefit of possession of jointly-owned property that has been occupied solely by the other spouse, and the nonpossessory spouse is thus generally awarded compensation for the use of his or her one-half interest in the property. This Court has discussed the analysis for deciding whether to award rental credit:

> First, the general rule is that the dispossessed party is entitled to a credit for the fair rental value of jointly held marital property against a party in possession of that property**, provided there are no equitable defenses to the credit**. Second, the rental credit is based upon, and therefore limited by, the extent

- 14 -

of the dispossessed party's interest in the property. Third, the rental value is limited to the period of time during which a party is dispossessed and the other party is in actual or constructive possession of the property. Fourth, the party in possession is entitled to a credit against the rental value for payments made to maintain the property on behalf of the dispossessed spouse.

*Id*. (citation omitted; emphasis added).

We find that the trial court did not abuse its discretion in declining to award Husband fair market rental on the Baldwin residence, which Wife exclusively possessed. That refusal was calculated primarily to offset the fact that Wife was not awarded fair market rental for her interest in the Hawley residence, which Husband exclusively controlled and to which Wife had no access. Moreover, Wife aided in expenses associated with the Hawley residence. In rejecting Husband's sixth position on appeal, we adopt the sound reasoning of the trial court, which disproves the existence of an abuse of discretion in connection with its decision to award Husband fair market value rental as to the Baldwin residence:

Both parties agreed that post-separation in 2007, the [Husband] consented to and the [Wife] was granted exclusive possession of the Baldwin Residence. July 22, 2011 Hearing Transcript at 83; June 21, 2013 Hearing Transcript at 61. Both parties testified that [Wife] made payments for utilities, homeowner's insurance, a line of credit against the residence with a balance of about $2,000, and property and school taxes for the years 2006-2007, 2007-2008, 2008-2009, and 2009-2010, while [Husband] contributed nothing to those expenses after leaving the Baldwin Residence. July 22, 2011 Hearing Transcript at 91; July 16, 2012 Hearing Transcript at 131, 196. Both parties testified that [Wife] had not paid property taxes for the years 2010-2011 or 2011-2012, July 16, 2012 Hearing Transcript at 131, but [Wife] attributed her inability to pay the

- 15 -

taxes to her support payments to [Husband] and her reduction in income from her disability. December 10, 2013 Hearing Transcript at 29-30. [Husband] testified that the annual property taxes cost about of $9,880, July 22, 2011 Hearing Transcript at 91, while [Wife] testified that they cost about $10,000 to $13,000. December 10, 2013 Hearing Transcript at 30. [Wife] added that she has been attempting to arrange for installment payments for unpaid taxes and interest, but the collector wants payment in-full. December 10, 2013 Hearing Transcript at 35-36. [Husband] claimed that the homeowner's insurance cost about $600-$1,000 per year, July 22, 2011 Hearing Transcript at 91, while [Wife] testified that it costs $233 per month and that she had paid it up-to-date. December 10, 2013 Hearing Transcript at 30. Additionally, while [Husband] testified that he made/paid for repairs/renovations to Baldwin Residence, July 22, 2011 Hearing Transcript at 89; July 16, 2012 Hearing Transcript at 131 -32, [Wife] claimed and testified that because the work had been done without permits, it would cost about $30,000 to repair before the Baldwin Residence could be sold. July 16, 2012 Hearing Transcript at 131-32; December 10, 2013 Hearing Transcript at 31-32. Regarding the rental value of the Baldwin Property, [Husband] testified that, based on his observation that the neighbor listed their smaller property for rent at about $2,400 per month, the Baldwin Residence could have been rented for about $2,500 or $2,800 per month. July 22, 2011 Hearing Transcript at 91-92.

Both parties testified that the monthly mortgage payments for the Hawley Residence were about $2,900 to $3,000 and included the taxes and insurance. July 22, 2011 Hearing Transcript at 39; July 16, 2012 Hearing Transcript at 134, 199; June 21, 2013 Hearing Transcript at 35, 90; September 27, 2013 Hearing Transcript at 90. [Husband] also testified that he paid "almost $1,500" in annual dues for the Hawley Residence. July 22, 2011 Hearing Transcript at 39. [Husband] claimed that over the course of three years, in total, he paid $98,000 on the mortgage, $4,000 in dues, $1,500 in utilities, and $4,000 in repairs needed to list them home for sale. Id. at 63-64. While [Husband] claimed that post-separation, [Wife] paid nothing toward the Hawley Residence's expense, *Id*. at 41, both parties agreed that [Wife] had been paying [Husband] about $900 per month to help pay the mortgage payments on the Hawley Residence. July 16, 2012 Hearing Transcript at 131-32.

- 16 -

[Husband] claimed that in August, 2010, for health reasons, he left the Hawley Residence but continued to pay expenses. July 22, 2011 Hearing Transcript at 41. On cross examination, [Husband] stated that up until several months before the July 16, 2012 Hearing, he had been living half the year at the Hawley Residence and half in California, but then claimed that he had not been living at the Hawley Residence for over a year. July 16, 2012 Hearing Transcript at 133-34. According to [Wife], since before May 2009, because [Husband] had changed the locks, she had not been to the Hawley Residence. June 21, 2013 Hearing Transcript at 129. [Husband] said that he was willing to rent the Hawley Residence, July 22, 2011 Hearing Transcript at 41, but [Wife] said that she did not want it to be rented prior to sale. September 27, 2013 Hearing Transcript at 145.

In addition, [Husband] testified that from the date of separation until November of 2008, he made the full mortgage payments, then paid fifty percent in December 2008 and January 2009, and then until May of 2009, per an arrangement with the bank, paid only the interest. June 21, 2013 Hearing Transcript at 35-37; September 27, 2013 Hearing Transcript at 145. [Wife] claimed to have contributed about $90,000 in total to the Hawley Residence Mortgage and that the amount that she paid regarding the Residence from separation until sometime in 2009 equaled the mount that [Husband] had paid regarding the property from 2009 until the June 21, 2013 Hearing. June 21, 2013 Hearing Transcript at 37, 50-51. Also, according to [Wife], [Husband] obstructed the sale of the Residence. *Id*. at 38 -40.

In claiming that the Hearing Master failed to assign a rental value to the Baldwin Residence and that [Wife] lived there "rent free and without having paid taxes," [Husband] once again mischaracterizes the testimony, evidence, and recommendation in this matter. The testimony and evidence presented by both parties clearly shows that the while the [Wife] had exclusive possession of the Baldwin Residence, she exclusively paid all costs associated with that residence, minus the two years of property taxes. Additionally, while [Husband] did not officially have exclusive possession of the Hawley Residence, he constructively had exclusive possession because he was the only one of the two parties to live at and use that residence during the majority of the post-separation period. Furthermore, he freely and willingly chose not to live exclusively in the Hawley Residence

and instead moved to California. Moreover, both parties testified and acknowledged that for much of the post-separation period, [Wife] contributed substantial payments to be used to pay the mortgage on the Hawley residence. Finally, the Hearing Master did not fail to assign a rental value to the Baldwin residence. Instead, based on the foregoing findings of fact, he determined that neither party was entitled to rent as part of the distribution.

Trial Court Opinion, 7/14/16, at 31-35.

Husband's final contention relates to the valuation placed on Wife's retirement assets. His position in this respect is confusing and undeveloped. There are two positions sufficiently articulated to address. Husband's first claim, which is that the Wife's retirement assets continued to grow after separation while his ceased increasing in value after he became disabled during the marriage, Appellant's brief at 44, is belied by the record. Wife presented proof before the master, in the form of statements, that her retirement accounts decreased after separation due to fluctuations in the stock market. In 2012, during the pendency of the hearings, Wife herself became disabled and started to work part-time and receive disability payments. Husband provided no indication to the trial court that Wife's retirement accounts had increased in value since the master's hearings. Husband readily could have established that Wife's retirement assets increased in value by presenting a motion for discovery as to that issue, especially after the master's report was not forthcoming in a timely manner. Wife had already supplied the necessary proof regarding the assets in question before the master and, contrary to Husband's vague assertions on

appeal, we are aware of no authority requiring a party to continue to provide evidence regarding a matter that already has been presented to the finder of fact.

The only other contention that this Court can discern with respect to Husband's position on Wife's retirement assets is that an annuity was overlooked in the equitable distribution equation. *Id*. This position is flatly refuted by the record. The annuity was purchased from Transatlantic Holdings, Inc., N.T. Hearing, 12/11/13, at 23, and that asset was included in the equitable distribution scheme. Trial Court Opinion, 7/14/16, at 35. Husband provides this panel with no grounds upon which to disturb the trial court's finding with respect to valuation of Wife's pension assets.

In conclusion, we reverse and remand for the equitable distribution scheme to be adjusted to reflect the fact that the Hawley residence had no value. In all other respects, we affirm.

Order affirmed in part and reversed in part. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

*Judgment Entered.*

_____
Joseph D. Seletyn, Esq.
*Prothonotary*


Date: <u>12/27/2017</u>

- 19 -